LEFRAK ORGANIZATION, INC., a New York Corporation; Cornell Leasing Corp., a New York Corporation; and Mid–State Management Corporation, a New York Corporation, Plaintiffs,

v.

CHUBB CUSTOM INSURANCE COMPANY, a Delaware Corporation, Defendant.

No. 95 Civ. 3200 (MBM).

United States District Court, S.D. New York.

Oct. 22, 1996.

Irene C. Warshauer, Howard E. Cotton, William G. Passannante, Peter J. Andrews, Anderson Kill & Olick, P.C., New York City, for Plaintiffs.

William P. Shelley, Cozen and O'Connor, New York City, for Defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

The Lefrak Organization, Inc. ("LOI"), Cornell Leasing Corp., and Mid–State Management Corp. (together, "Lefrak") bring this action against their insurance company, Chubb Custom Insurance, for declaratory relief and damages arising from Chubb's refusal to defend Lefrak in a negligence action alleging lead paint poisoning at Lefrak-owned property. Plaintiffs seek a summary judgment declaring that Chubb must defend them in the negligence action. Chubb has cross-moved for a judgment that it is not so obligated, because lead paint poisoning falls within the pollution exception to the policy in question. Because the pollution exception is ambiguous as applied to the facts of this case, and because ambiguities in insurance contracts must be resolved against the insurer, plaintiffs' motion for summary judgment is granted.

I.

When evaluating cross-motions for summary judgment, the court considers each motion separately, and on each views the facts in the light most favorable to the non-moving party. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993).

The facts of this case essentially are undisputed: LOI, through affiliated entities including Cornell and Mid–State, owns, manages and rents apartment buildings in New York City. (Compl. ¶ 2) Chubb provides and underwrites liability insurance policies. (*Id.* ¶ 11) In 1993 Lefrak purchased from Chubb a $1.35 million General Liability Insurance Policy for certain of its properties for the policy year June 20, 1993 to June 20, 1994. Lefrak subsequently extended the policy for an additional year, from June 20, 1994 to June 20, 1995. (Klein Aff. ¶ 21)

The General Liability Insurance Policy, a form insurance contract drafted by representatives of the insurance industry, describes the scope of its coverage in pertinent part as follows:

> We will pay damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of:
>
>> bodily injury or property damage caused by an occurrence; or personal injury . . . .
>
> We will defend any claim or suit against the insured seeking such damages. We will pay in addition to the applicable limit of insurance the defense expense.

(Klein Aff., Ex. A at 1)

Damages resulting from "Pollution" are specifically excluded from coverage under the policy. The scope of that exclusion is defined as follows:

> 1. bodily injury or property damage arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:
>
>> a. at or from premises which are or were at any time owned or occupied by, or rented or loaned to any insured;
>>
>> b. at or from any premises, site or location which is or was at any time used

by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

c. which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

d. at or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

    i. if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

    ii. if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of pollutants. . . .

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

(*Id.*, Amendment at 1)

Cornell owns and Mid–State manages an apartment building at 665 New York Avenue in Brooklyn. From March 1, 1993 to February 28, 1995 the Allman family leased and resided at apartment 5–P in that building. (Compl. ¶ 27)

On November 8, 1994, Ashley Allman, an infant, by her mother and natural guardian Michelle Allman, and Michelle Allman individually, sued Cornell and Mid–State in New York Supreme Court, Kings County, for negligence arising from Ashley's exposure to lead paint at the Allman apartment. Their complaint alleges that tests on October 26, 1994 by the Department of Health showed that "there was paint on interior surfaces of [the Allman apartment] which contains me-

tallic lead based paint in the non-volatile content of the paint resulting in violation of the New York City Health Code." (Negligence Compl. ¶ 13)[1] The complaint further alleges that Ashley Allman, was "seriously permanently and catastrophically injured as a proximate result of the failure . . . to properly, adequately, and reasonably operate, maintain, and control" the building in which the apartment was located. (Negligence Compl. ¶ 15) The Negligence Complaint says nothing about how Ashley Allman was exposed to the lead paint—*i.e.*, whether she ingested paint chips or inhaled lead dust—or whether a particular event, such as stripping the walls, precipitated her injuries. The Allmans seek $3 million in compensatory damages and $1 million in punitive damages from Cornell and Mid–State.

Cornell immediately notified Chubb of the negligence action and asked Chubb to defend and indemnify it. (Klein Aff. ¶¶ 29–30 & Ex. C) Because the demand was so large, Cornell also notified its Excess Liability Carrier. (*Id.*, Ex. C) By letter dated January 5, 1994, Chubb denied Cornell's request for coverage on two grounds. (*Id.* ¶ 32 & Ex. E) First, Chubb told Cornell that the facts presented by the Allman claim "do not describe an 'occurrence,' 'bodily injury' or 'personal injury' within the meaning of the policy," and therefore are not insured by the policy. (*Id.*, Ex. E) Second, Chubb reminded Lefrak of the pollution exclusion and stated that it served "to preclude coverage in this matter." (*Id.*)

On May 5, 1995, Lefrak sued in this court for declarations that (1) Chubb must indemnify Lefrak for any liability in the negligence action, and (2) Chubb must defend Lefrak in the negligence action. Lefrak also seeks damages resulting from breach of the insurance contract and breach of the covenant of good faith and fair dealing. Only the issue on which both parties seek summary judgment—whether Chubb has a duty to defend Lefrak in the negligence action—is addressed in this opinion.

---

1. "Negligence Complaint" refers to the complaint in the action filed by the Allmans against     plaintiffs Cornell and Mid–State.

## II.

Jurisdiction in this case is based on diversity of citizenship. 28 U.S.C. § 1332(a) (1994). Each of the three plaintiffs—LOI, Cornell, and Mid–State—is a New York corporation with its principal place of business in New York. (Klein Aff. ¶¶ 10–12) Defendant Chubb is a Delaware corporation with its principal place of business in New Jersey. (*Id.* ¶ 13) The value of the declaratory judgments sought by plaintiffs—*i.e.*, the value of defending and indemnifying Lefrak in the negligence actions—combined with the demand for damages, exceeds the $50,000 statutory minimum. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 346, 97 S.Ct. 2434, 2443, 53 L.Ed.2d 383 (1977); *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87 (2d Cir.1991). Because this is a diversity case, this court sits in New York, and the parties have not specified otherwise, New York law controls. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

## III.

■ Basic principles of contract law govern the interpretation of insurance contracts. *State v. American Mfrs. Mut. Ins. Co.*, 188 A.D.2d 152, 154, 593 N.Y.S.2d 885, 886 (3d Dep't 1993). The fundamental objective of contract interpretation is to give effect to the expressed intention of the parties. *Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.*, 19 F.3d 78, 81 (2d Cir.1994). The words in the contract are given their ordinary, nontechnical meaning. *Rocon Mfg. Inc. v. Ferraro*, 199 A.D.2d 999, 999, 605 N.Y.S.2d 591, 592 (4th Dep't 1993). If a reasonably prudent layperson would find the words unambiguous, the court will enforce that unambiguous meaning. *Ace Wire & Cable Co. v. Aetna Casualty & Surety Co.*, 60 N.Y.2d 390, 398, 469 N.Y.S.2d 655, 658, 457 N.E.2d 761, 763–64 (1983). However, if language suggests more than one meaning to the reasonably prudent person, or if reasonably prudent people would disagree about its meaning, that language is ambiguous. When the meaning of ambiguous language is in dispute, the parties may present extrinsic evidence of their intent at the time of contract-

ing to cure the ambiguity. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983).

■ Certain additional guidelines apply to an insurer's duty to defend. The duty to defend is "exceedingly broad," *Colon v. Aetna Life & Casualty Ins. Co.*, 66 N.Y.2d 6, 8–9, 494 N.Y.S.2d 688, 689, 484 N.E.2d 1040, 1040–41 (1985), and a court must find in favor of the insured when the allegations in the underlying complaint suggest a "reasonable possibility" of coverage. When such a reasonable possibility exists, the insurer must defend its insured, regardless of the ultimate determination of the scope of the policy or the merits of the underlying action. *Fitzpatrick v. American Honda Motor Co.*, 78 N.Y.2d 61, 65–66, 571 N.Y.S.2d 672, 673–74, 575 N.E.2d 90, 91–92 (1991).

■ The insurer may avoid the duty to defend only by establishing that the policy unmistakably excludes the underlying action. *Continental Casualty Co. v. Rapid–American Corp.*, 80 N.Y.2d 640, 652, 593 N.Y.S.2d 966, 972, 609 N.E.2d 506, 512 (1993). The insurer may do so by relying on clear policy language or extrinsic evidence that reveals the intent of the parties to exclude particular actions. If the insurer meets that burden by either method, a court will find an absence of a duty to defend.

■ If the insurance company fails to satisfy its burden of establishing a policy exclusion, the ambiguous language must be construed against the insurer, as the drafter of the contract. *Ace Wire*, 60 N.Y.2d at 398, 469 N.Y.S.2d at 658, 457 N.E.2d at 763–64. That proposition derives from the maxim of *contra proferentem* and is based in part on the insurance company's control over policy language. The cost of a failure to clarify is imposed on the drafting party, to encourage that party to clarify its language in the future. Put another way, if the insurance company had wanted to exclude certain claims, especially foreseeable claims, it could have and should have listed those exclusions in the policy and, if necessary, bargained for their adoption. If an insurance company did not make an exclusion explicit at the time of contract drafting and bargaining (if there was any bargaining), it cannot benefit from

that ambiguity at the time of litigation. *See generally* 69 N.Y.Jur.2d §§ 715–19 (1988) (discussing rationale for construction in favor of the insured). The *contra proferentem* doctrine exerts even more force on policy exclusions. The purpose of an insurance policy is to provide protection to the insured. To give effect to that purpose, limitations on coverage must be construed narrowly. *See, e.g., McCostis v. Home Ins. Co. of Indiana,* 31 F.3d 110, 112 (2d Cir.1994).

## IV.

The Second Circuit recently applied the principles of interpretation recited above to a pollution exclusion much like the one in dispute here. In *Stoney Run Co. v. Prudential–LMI Commercial Ins. Co.,* 47 F.3d 34 (2d Cir.1995), the insured sought a declaration that its insurance company was obliged to defend it in several civil actions arising from carbon monoxide poisoning in an apartment. The insurance company relied on the policy's pollution exclusion, which, like the one involved here, disclaimed coverage for bodily injury or property damage arising from the " 'the discharge, dispersal, release or escape of pollutants,' " and defined pollutants as " 'any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.' " *Id.* at 36. The district court found that the insurer had demonstrated that the carbon monoxide related actions unambiguously fell within that pollution exclusion and granted summary judgment to the insurer. *Id.* at 35.

The Second Circuit reversed. The Court began its analysis by stating that the standard pollution clause must be construed in light of its general purpose—to exclude coverage for *environmental* pollution. *Id.* at 37–38. The Court then concluded that the release of carbon monoxide into an apartment could not properly be categorized as environmental pollution, and that as a consequence, the pollution exclusion reasonably could be interpreted as not excluding coverage for the carbon monoxide action. *Id.* ("A reasonable interpretation of the pollution exclusion clause is that it applies only to environmental pollution, and not to all contact with substances that can be classified as pollutants.") To bolster its conclusion the Court cited the decisions of other courts that also limited the same pollution exclusion to "environmental" pollution. *Id.* (citing *Regional Bank of Colo., N.A. v. St. Paul Fire and Marine Ins. Co.,* 35 F.3d 494, 498 (10th Cir. 1994); *Thompson v. Temple,* 580 So.2d 1133, 1135 (La.Ct.App.1991); and others).

Although the *Stoney Run* Court did not define "environmental," and explicitly declined to extend its ruling beyond the facts of that case, the Court made clear that the release of poisonous gas into an apartment was not encompassed by that term. Because the pollution occurred indoors, it was not "environmental." The Court did not dictate that its reading was the only plausible reading of the pollution exclusion, but held only that it was one of several (or at least more than one) reasonable readings of the clause. Accordingly, because the pollution exclusion clause was ambiguous as applied to facts presented, the insurance company's motion for summary judgment could not properly be granted. 47 F.3d at 39.

Viewing the policy here in light of those principles and that precedent, I conclude that the policy reasonably can be read to cover the Allmans' lead paint poisoning claims.

In pertinent part, the pollution exclusion in Chubb's policy exempts from coverage claims for bodily injury or property damage that: (1) arise from the "discharge, dispersal, seepage, migration, release or escape of," (2) "pollutants," defined as "any ... irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste."

### A. Did Ashley Allman's injuries arise out of the "discharge, dispersal, seepage, migration, release or escape" of lead paint?

██ "Discharge, dispersal, seepage, migration, release, and escape" is a list of the ways by which the pollutant must travel from a contained place to the injured person's surroundings and then cause injury. In contrast, injuries caused by irritants that normally are stationary, but that can be shifted or moved manually, are not excluded from coverage because they do not cause injury by one of the prescribed methods. For exam-

ple, if a child were injured because he drank from a bottle of drain cleaner or some other household product, even if that product properly could be classified as a "pollutant," the injury would not be covered by the pollution exclusion because the pollutant was not disseminated by one of the prescribed methods.

■ Here, it is not clear precisely how Ashley Allman was injured by lead paint. The Negligence Complaint states only that an inspection revealed the presence of lead paint in the apartment, and that Ashley Allman was catastrophically injured thereby. From this, plaintiffs argue that the list of methods of injury is inapplicable here because the complaint does not allege that the lead paint caused injury in one of the listed ways. Although linguistically accurate, plaintiffs' argument is logically flawed. Common sense tells us that lead paint that never leaves a wall or ceiling does not cause harm. Implicit in the Negligence Complaint, therefore, must be an allegation that the lead paint somehow separated from the wall or ceiling, and entered the air, or fell on the floor, furniture or fixtures in the apartment. One possibility is that lead dust flaked off the walls and was inhaled by Ashley Allman. Another is that the lead paint chipped, and that Ashley Allman ingested those chips.

Although flaking, peeling, chipping, crumbling and falling are not among the listed methods of disseminating pollution, it is arguable, and several courts have found, that the presence of lead dust or chips in an apartment qualifies as "discharge," "dispersal," or even more generally, as "release." See, e.g., Oates by Oates v. State, 157 Misc.2d 618, 597 N.Y.S.2d 550 (Ct.Cl.1993) (holding lead paint poisoning covered by the pollution exclusion), appeal withdrawn after settlement, 206 A.D.2d 979, 615 N.Y.S.2d 993 (1st Dep't 1994); St. Leger v. American Fire & Casualty Ins. Co., 870 F.Supp. 641 (E.D.Pa. 1994) (same), aff'd without opinion, 61 F.3d 896 (3d Cir.1995); Kaytes v. Imperial Casualty & Indemnity Co., No. Civ. A. 93–1573, 1994 WL 780901 (E.D.Pa. Jan. 6, 1994) (same). On that interpretation, it might be permissible for Chubb to refuse to defend Lefrak in the Allman negligence action.

However, the holding of Stoney Run and the specifics of the Allman action suggest the opposite conclusion—that the way in which lead paint harmed Ashley Allman is not included in the pollution exclusion. The holding of the Second Circuit in Stoney Run— that the ordinary person could read the words of that policy as the argot of environmental law that applies to environmental pollution only, and that carbon monoxide poisoning in an apartment is not covered by that exclusion—supports the conclusion that the pollution exclusion may not apply in this case. Stoney Run, 47 F.3d at 37; Rapid–American, 80 N.Y.2d at 654, 593 N.Y.S.2d at 973, 609 N.E.2d at 513; see also Weaver v. Royal Ins. Co. of America, 140 N.H. 780, 674 A.2d 975, 977–78 (1996) (holding that "discharge, dispersal, release, and escape" are terms of art of environmental law); Sullins v. Allstate Ins. Co., 340 Md. 503, 667 A.2d 617, 622–23 (1995) (same); Atlantic Mutual Ins. Co. v. McFadden, 413 Mass. 90, 595 N.E.2d 762, 764 (1992) (same). Because the poisoning occurred inside an apartment, the lead paint might not be regarded as an environmental pollutant and therefore coverage would not be excluded. See United States Liability Ins. Co. v. Bourbeau, 49 F.3d 786, 789 (1st Cir.1995) (holding that the discharge of paint chips into soil was covered by the pollution exclusion because it polluted the environment, but that the presence of lead paint in a household would not be so covered). The clause at issue here bars coverage for pollutants that cause injury also through "migration" or "seepage"—methods not included in the Stoney Run pollution exclusion—but there is no reason to believe that the inclusion of those terms requires a different result.

Defendant's position that the Rapid–American decision of the New York Court of Appeals, on which the Stoney Run Court relied, is distinguishable, ignores the reasoning of both of those cases. The clause at issue in Rapid–American, known informally as the "sudden and accidental" pollution exclusion, the predecessor of the exclusion at issue here, denied coverage for:

personal injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids,

alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants *into or upon land, the atmosphere or any water course or body of water;* but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

80 N.Y.2d at 646–47, 593 N.Y.S.2d at 968, 609 N.E.2d at 508 (emphasis added). The Court held that the exclusion did not bar coverage for asbestos exposure, in part because the exclusion covered environmental pollution only. *Id.* 593 N.Y.S.2d at 972–73, 609 N.E.2d at 512–13. Chubb argues that the absence of the underlined language indicates that the applicability of the pollution exclusion is no longer limited to environmental pollution. But Chubb ignores that the New York Court of Appeals based its conclusion in *Rapid–American* also on the finding that "discharge," "dispersal," "release" and "escape" are environmental terms of art, regardless of the language that follows. Chubb ignores as well that the Second Circuit in *Stoney Run* construed a policy also devoid of the underlined language, and more similar to the one at issue here than the policy in *Rapid–American,* and concluded also that the exclusion could be read to apply only to injury from environmental pollution. Indeed, the conclusion that "discharge," "dispersal," "release" and "escape" are distinctly environmental terms would make the underlined language largely redundant. *Sullins,* 667 A.2d at 622.

Defendant argues further that the clause at issue here cannot be limited to outside, environmental injury, because that interpretation would render meaningless the clause stating that the excluded injury may result from pollution "at or from premises which are or were at any time owned or occupied by, or rented or loaned to any insured." (Klein Aff., Ex. A, Amendment at 1, ¶ 1(a)). Defendant's theory seems to be that "premises" are made-up entirely of interior space, and that for that subsection of the pollution exclusion to exclude any coverage, it must encompass injuries arising from pollutants inside the building. But the policy does not define "premises," and common understanding suggests another meaning of the term. Webster's Dictionary defines "premises" as:

3.a. Land and the buildings on it,

b. A building or section of a building.

*Webster's II: New Riverside University Dictionary* (1984). The second quoted definition is consistent with Chubb's argument, but the first suggests that the "premises" of an apartment building include also the outdoor space associated with that building, such as grassy areas around the building, a parking lot, and areas for garbage disposal. Under that definition, pollution could well occur at the premises and still be "environmental." Thus, the limitation of the pollution exclusion to environmental pollution is not inconsistent with the "premises" language of the policy.

The exclusion of coverage for "bodily" injuries also is not inconsistent with limiting the exclusion to environmental injury. Rather, it excludes bodily injuries that result from a person's contact with environmental pollution, such as respiratory disorders that result from breathing smog-filled air, cancers that result from drinking acid-rain-contaminated water, and the like. Under that reading of the pollution exclusion—which is reasonable, if for no other reason, because binding authority says so—coverage for lead poisoning claims arising from conditions inside an apartment could not be denied.

**B.** *Is lead paint a "pollutant?"*

Whether lead paint reasonably can be characterized as a "pollutant" under the policy also is open to dispute. Read alone, the phrase used to define pollutant—"any irritant or contaminant"—arguably encompasses any object, chemical, or other substance that irritates or contaminates the human body. *See Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.,* 976 F.2d 1037, 1043 (7th Cir.1992) ("The terms 'irritant' and 'contaminant,' when viewed in isolation, are virtually boundless, for 'there is virtually no substance or chemical in existence that would not irritate or damage some person or property.' ") (citation omitted). On that all-inclusive reading, lead paint, which irritates the body by causing, *inter alia,* brain damage, developmental disorders, kidney and liver disease, and which contaminates the body by injecting impurities into the blood stream, qualifies as a "pollutant." Several courts and

commentators have embraced that broad reading of the term. *See, e.g., Bourbeau,* 49 F.3d at 788–89 (holding that an objectively reasonable person would consider lead paint chips to be a "solid contaminant," a "toxic chemical," and "waste"); *Oates,* 597 N.Y.S.2d at 553–54 (observing the impossibility of listing every possible pollutant individually); *St. Leger,* 870 F.Supp. at 643 (citing federal statutes and regulations that address lead poisoning); *Kaytes,* 1994 WL 780901, at *1 ("Lead is a chemical that irritates and contaminates"); Alan C. Eagle & Anne M. Murray, *The Lead–Based Paint Coverage Claim: Keep it Simple,* 19 Mealy's Litig. Rep.: Ins. 16 (Mar. 19, 1996); Mark J. Manta, *The Absolute Pollution Exclusion: The Inside Story,* 3 Mealy's Litig. Rep.: Ins. 19 (Nov. 14, 1995).

But the policy's definition of "pollutants" is susceptible of another, equally reasonable meaning. *Id.* ("Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results."). The insurance policy provides a list of examples of pollutants, presumably to address specific cases and to shed light on the meaning of the first part of the definition even in cases not specifically addressed by one of the examples. Although that list is not exclusive, it reasonably may be read to narrow the broad reading described above. The examples listed—smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste—are either products used to operate equipment or machinery or byproducts of the operation of equipment or machinery. The fumes emitted by a car readily come to mind.

Lead paint is neither among the listed examples, nor closely related to a listed example. Lead paint flakes, chips, or dust are not used to operate machinery or equipment, nor are they byproducts thereof. Rather, lead is an ingredient in paint that causes harm when, through age and normal use, the paint flakes off walls, and is either inhaled or ingested. On that more limited reading of pollutant, which would include only the products and byproducts associated with the operation of equipment or machinery, lead paint is not a pollutant. *See, e.g., McFadden,*

595 N.E.2d at 764 (finding that an insured could reasonably understand the pollution exclusion to "exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence."). Accordingly, it is at least plausible that the pollution exclusion was not meant to and does not apply to lead exposure claims.

There are several lower state court cases, cited by both plaintiff and defendant that interpret the pollution exclusion, as applied to lead poisoning and other injuries, in seemingly incongruous ways. The relevant Appellate Division cases are: *American Heritage Realty Partnership v. La Voy,* 209 A.D.2d 749, 618 N.Y.S.2d 125 (3d Dep't 1994) (holding that removal of insulation that released asbestos—a "thermal irritant"—into an apartment, was covered by the pollution exclusion); *Miano v. Hehn,* 206 A.D.2d 957, 614 N.Y.S.2d 829 (4th Dep't 1994) (exposure to asbestos in apartment not covered by pollution exclusion); *Demakos v. Travelers Ins. Co.,* 205 A.D.2d 731, 613 N.Y.S.2d 709 (2d Dep't 1994) (seepage of smoke from basement to apartment is covered by the pollution exclusion); *Karroll v. Atomergic Chemetals Corp.,* 194 A.D.2d 715, 600 N.Y.S.2d 101 (2d Dep't 1993) (accidental spraying of sulfuric acid was not covered by the pollution exclusion); and *Henry Modell & Co. v. General Ins. Co. of Trieste & Venice,* 193 A.D.2d 412, 597 N.Y.S.2d 75 (1st Dep't 1993) (dust and debris in apartment resulting from subway construction project is covered by the pollution exclusion). The relevant trial court decisions are: *B.U.D. Sheetmetal v. Massachusetts Ins. Co.,* No. 3513–93 (Sup.Ct.Albany County 1995) (indoor spraying of toxic cleaning solution was within pollution exclusion); *General Accident Ins. Co. v. Idbar Realty Corp.,* 163 Misc.2d 809, 622 N.Y.S.2d 417, 419 (Sup.Ct.Suffolk County 1994) (holding that pollution exclusion did not apply to claim arising from ingestion of lead paint, because exclusion reasonably may be limited to environmental claims), *aff'd as modified,* —— A.D.2d ——, 646 N.Y.S.2d 138 (2d Dep't 1996); and *Generali–U.S. Branch v. Caribe Realty Corp.,* 160 Misc.2d 1056, 612 N.Y.S.2d 296, 298–99 (Sup.Ct. New York County 1994) (same).

Defendant heroically attempts to harmonize these cases as follows: "[w]here bodily injury or property damage is caused by 'routine commercial hazards,' the pollution exclusion is inapplicable; conversely, where bodily injury or property damage is caused by exposure to an environmental (indoor or outdoor) condition, the pollution exclusion precludes coverage." (Def. Surreply Mem. at 8) Defendant contends that lead paint is an environmental condition, rather than a routine commercial hazard. However, defendant fails to provide authority or even theory to help define those terms.

Fortunately, I need not undertake the labor of rationalizing pollution exclusion caselaw. The Second Circuit's opinion in *Stoney Run* mandates that the "environmental" reading of the pollution exclusion be given as much credence as any other. To deny Lefrak's motion and grant Chubb's would defy that mandate.

Further, the range and variety of judicial opinions bolsters the conclusion that the pollution exclusion here is ambiguous. That range alone does not absolve me of the responsibility to enforce the plain meaning of unambiguous language, were I to find the language unambiguous. But here, the range of interpretations, together with the reasons discussed above, shows the language at issue is ambiguous. *See Sullins*, 667 A.2d at 623–24 (discussing disagreement among courts as to whether conflicting judicial opinions is evidence of ambiguous policy language). That ambiguity triggers Chubb's duty to defend, and warrants partial summary judgment for plaintiff.

## V.

Chubb's last ditch, since abandoned, was that summary judgment in Lefrak's favor imposing a duty to defend was unwarranted because discovery might show that the parties had agreed, despite the policy language, that the pollution exclusion covered lead paint claims. I permitted discovery on that issue, and Chubb has now forthrightly conceded that there is no evidence that Lefrak so agreed. Def. Sept. 5, 1996 Ltr. at 3.

However, Chubb would establish a new line of defense based on a recent New York Court of Appeals decision, *Juarez v. Wavecrest Management Team, Ltd.*, No. 130, 88 N.Y.2d 628, 649 N.Y.S.2d 115, 672 N.E.2d 135 (N.Y.Ct.App.1996), decided last July, which Chubb reads as holding that the hazard of lead paint is inherently "environmental" in nature, and is therefore covered by the pollution exclusion. I do not so read the case. *Juarez* dealt with a landlord's liability under New York City's Local Law 1, requiring removal or covering of lead paint in multiple dwellings, Administrative Code of the City of New York § 27–2013(h), and specifically with whether notice of the lead paint condition is necessary before such liability may be imposed. In a discussion of the history of that law, the court quoted the 1993 report of a mayoral advisory committee that referred to lead-paint poisoning as an "environmental disease." *Id.* at 641, 649 N.Y.S.2d at 119, 672 N.E.2d at 139. The court at that point was not even construing the law, let alone an insurance policy or the duty of an insurer to defend. The quoted phrase is not even dictum supporting Chubb's position here.

*General Accident Ins. Co. of America v. IDBAR Realty Corp.*, —— A.D.2d ——, 646 N.Y.S.2d 138 (2d Dep't 1996), also handed down in July, which Chubb argues was decided in ignorance of and is superseded by *Juarez*, is actually closer to the mark in its holding that an insurer has a duty to defend, although not necessarily to indemnify, notwithstanding a pollution exclusion. However, the clause at issue in *IDBAR* is not quoted in the opinion, which in any event adds little to *Stoney Run*.

\*   \*   \*

For the reasons explained above, there is more than a reasonable possibility that the insurance policy provides coverage for the lead poisoning claims asserted against Lefrak in the Allman negligence action. Accordingly, Lefrak's motion for partial summary judgment is granted and Chubb must fulfill its duty to defend.

SO ORDERED.