AUTO–OWNERS INSURANCE COMPANY, Respondent,

v.

Samantha HANSON, a minor, through her Guardian ad Litem, Christine DeMoss, Appellant,

Kelley O'Neill, d/b/a Spruce Shadow Farm, n/k/a Sheep Improvement Company, et al., Defendants.

No. C6–98–1480.

Court of Appeals of Minnesota.

Feb. 16, 1999.

Timothy P. Tobin, Elliot L. Olsen, Gislason, Dosland, Hunter & Malecki, P.L.L.P., Minnetonka, MN (for respondent).

William D. Harper, Paul D. Peterson, Law Office of William D. Harper, Chrtd., Woodbury, MN (for appellant).

Considered and decided by TOUSSAINT, Chief Judge, CRIPPEN, Judge, and MULALLY,* Judge.

## O P I N I O N

CRIPPEN, Judge.

Appellant disputes the trial court's declaratory judgment that coverage for her bodily injury claim is precluded by a so-called "absolute pollution exclusion" for injuries arising out of dispersal of pollutants. We affirm.

## FACTS

Appellant, Samantha Hanson, was an infant during the time from November 1993 through July 1994 when her family lived at rental property owned by the O'Neill Trust (defendant Cynthia Kelley O'Neill Trust 1954 Trust No. 1). She alleged in her complaint in the underlying action that she suffered severe health problems as a result of ingestion and absorption of lead in paint at the property. Specifically, sill and frame window pieces containing lead paint dislodged when the windows were opened and closed, and it was alleged that she ate some of these pieces. Defendants tendered defense of the action to respondent Auto–Owners Insurance Company. Respondent denied coverage on the basis of the "absolute pollution exclusions."[1]

The commercial umbrella policy for defendant O'Neill Trust for the period April 1, 1994, through April 1, 1995, contained an exclusion for injuries and damage resulting from "discharge, release, escape, seepage, migration or dispersal of pollutants" "at or from any premises" owned by an insured. The policy defined pollutant as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, liquids, gases and waste."[2]

The trial court found that the exclusion applied, stating that "[b]ecause of its irritant effects on the human body, lead is an 'irritant or contaminant, including * * * chemicals * * * and waste.' " The court added: "Ms. Hanson alleges that the paint was chipping or flaking. This could also constitute a discharge, release or migration."

## ISSUE

Does the so-called "absolute pollution exclusion" clause in the polices preclude appellant's bodily injury claim?

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. Art. VI, § 10.

1. The exclusions at issue are known as "absolute pollution exclusions" to differentiate them from the earlier widely used pollution exclusions that limited the definition of pollutants to those that contaminated the "land, atmosphere, or any water course or body of water," and did not apply if the contamination was "sudden and accidental."

2. The language of the O'Neill Trust's partially applicable 1993–94 policy contained an identical definition of pollution, with a simpler exclusionary clause that was principally the same but did not contain the "at or from any premises" language. The other defendant, Kelley O'Neill, the farm operator and lessor of the premises, had a farm policy with an exclusion almost identical to that of the O'Neill Trust's 1994–95 policy.

## ANALYSIS

■ The interpretation of an insurance contract is a question of law as applied to the facts presented. *Iowa Kemper Ins. Co. v. Stone*, 269 N.W.2d 885, 887 (Minn.1978). We review questions of law de novo. *Garrick v. Northland Ins. Co.*, 469 N.W.2d 709, 711 (Minn.1991).

### 1.

■ Initially we must determine whether lead in paint in a home is a pollutant within the meaning of the policy's pollution exclusion. Our analysis is governed by *Board of Regents v. Royal Ins. Co.*, 517 N.W.2d 888 (Minn.1994). In *Royal*, the supreme court applied a non-technical, plain-meaning approach to interpreting a pollution exclusion, and found that asbestos fibers qualified as an "irritant" where the policy precluded from coverage damages caused by the "discharge, dispersal, release or escape of * * * irritants." 517 N.W.2d at 890–92. The court stated that it would be "a disservice to the English language if we were to say that asbestos fibers, which are a health hazard because of their irritant effects on the human body, were not an irritant," and thereby concluded its analysis of whether asbestos fibers fell within the policy's list of pollutants. *Id.* at 892.

■ Following *Royal* and applying a non-technical approach to the exclusion at issue, we find that lead in paint falls within the policy's definition of pollutant. *See United States Liab. Ins. Co. v. Bourbeau*, 49 F.3d 786, 788–89 (1st Cir.1995) (a reasonable insured could not "possibly believe that 'smoke,

vapor, soot, [and] fumes' would be considered pollutants while lead paint would not"); *St. Leger v. American Fire & Cas. Ins. Co.*, 870 F.Supp. 641, 643 (E.D.Pa.1994) (it is widely understood that lead is a chemical that irritates and contaminates); *Oates by Oates v. State*, 157 Misc.2d 618, 597 N.Y.S.2d 550, 554 (N.Y.Ct.Cl.1993) (lead paint is a chemical and a contaminant that can irritate or poison).

Applying an ordinary meaning approach to the pollution exclusion also coincides with Minnesota's general rule for insurance policy interpretation. *See Farmers Home Mut. Ins. Co. v. Lill*, 332 N.W.2d 635, 637 (Minn. 1983) (insurance policy interpreted according to its plain, ordinary meaning and what a reasonable person would have thought it meant). This contradicts a line of cases in other states that find either (1) the exclusion unambiguously does not exclude lead paint in a home, or (2) the language is ambiguous and therefore the exclusion does not apply. These cases are premised on a technical rather than an ordinary reading of the exclusion, ascribing to the reader a knowledge of "terms of art" in environmental law and thus are inconsistent with *Royal*[3] and inapplicable to Minnesota cases.[4] *See Atlantic Mut. Ins. Co. v. McFadden*, 413 Mass. 90, 595 N.E.2d 762, 764 (Mass.1992) (lead paint definitively excluded from the definition of pollutant because the exclusion uses the words "discharge," "dispersal," "release," and "escape," terms of art in environmental law that generally refer to injury caused by hazardous waste, not lead contained in paint applied in a residence); *Bourbeau*, 49 F.3d at 789 (lead paint in house not a pollutant under exclusion corroborated by use of "terms of art" in

---

**3.** In addition to rejecting the "terms of art" approach to interpreting the exclusion, *Royal* also refutes the view of the court in *Lefrak Org., Inc. v. Chubb·Custom Ins. Co.*, 942 F.Supp. 949, 956 (S.D.N.Y.1996), that the exclusion is susceptible to the interpretation that pollutants must emanate from the operation of machinery. *Compare Royal*, 517 N.W.2d at 892 (rejecting the argument that asbestos fibers are not pollutants because they are a naturally occurring mineral rather than a by-product of industrial pollution); *with Chubb*, 942 F.Supp. at 956 (lead paint is not related to the other materials listed, which are either used to operate machinery or equipment, or are a by-product of such use).

**4.** *Royal* also refutes a Wisconsin Court of Appeals evaluation of whether lead in paint in a home qualifies as a pollutant. *See Peace v. Northwestern Nat'l Ins. Co.*, 215 Wis.2d 165, 573 N.W.2d 197 (Wis.App.1997). In *Peace*, the court found that coverage was not precluded because (1) the insurer could "reasonably expect" coverage of such a claim, and (2) lead in paint was not a contaminant because it was deliberately added by the manufacturer. *Id.* at 200. In *Royal*, the court specifically rejected a "reasonable expectation of the insurer" analysis because the exclusion was not hidden in the definition section of the policy, and it also stated that "the exclusion defines itself by characterizing the activity of the *pollutant*," 517 N.W.2d at 891 (emphasis added).

environmental law that generally apply to injury caused by hazardous waste, not lead paint); *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 667 A.2d 617, 620–22 (Md.1995) (exclusion ambiguous because use of "terms of art" provided basis for reasonable alternative interpretation that it only applied to pollution of the natural environment, rather than lead paint in a home); *Weaver v. Royal Ins. Co.*, 140 N.H. 780, 674 A.2d 975, 977 (N.H.1996) (same); *Generali–U.S. Branch v. Caribe Realty*, 160 Misc.2d 1056, 612 N.Y.S.2d 296, 298–99 (N.Y.Sup.Ct.1994) (same).

Jurisdictions that follow the ordinary-meaning approach reach the conclusion that lead in paint is a pollutant under the policy's definition. *See Shalimar Contractors v. American States Ins. Co.*, 975 F.Supp. 1450, 1457 (M.D.Ala.1997) ("a laborious reading of the terms 'discharge, dispersal, release and escape'" as to confine the exclusion to pollution of the natural environment was inconsistent with Alabama law, whereby terms of an exclusion must be given the meaning that a person of ordinary intelligence would reasonably attribute to them); *see also St. Leger*, 870 F.Supp. at 643; *Kaytes v. Imperial Cas. & Indem. Co.*, No. 93–1573, 1994 WL 780901, at *1 (E.D.Pa. Jan.6, 1994).

We also observe that the additional holding in *Royal*, that the definition of pollutant is determined with careful reference to the policy's description of the object polluted, mandates our determination that lead in paint in a home qualifies as a pollutant under the exclusion at issue. *Royal* involved the interpretation of two policies. In one, the exclusion precluded coverage for damage arising out of contamination into or upon land, "the atmosphere," or any water course or body of water. 517 N.W.2d at 890. The other excluded from coverage damages caused by pollution of land, water, "air," or real or personal property. *Id.* at 893. The court concluded that with the change of the object polluted from "atmosphere" to "air," the excess policy enlarged the scope of the exclusion and encompassed pollution of the air

within a building by asbestos fibers. *Id.* at 893–94.[5]

The "absolute pollution exclusion" clause at issue eliminates all language limiting coverage by describing the objects to be affected by the pollutants. The policy only states that the "dispersal," etc. must occur "at or from" the insured premises. Because the scope of what qualifies as a pollutant has been controlled to a considerable extent by the policy language describing the objects polluted, when there is no such language, the scope of the exclusion is in its broadest form, and in this case it encompasses lead paint in a house.

The observation that the omission of the "into or upon the land, atmosphere, or any water course or body of water" clause significantly broadens the scope of the exclusion is corroborated by courts in other jurisdictions that have addressed the issue. *See Shalimar*, 975 F.Supp. at 1457 (finding the deletion of the clause made the exclusion "far broader" than the previous exclusion); *Oates*, 597 N.Y.S.2d at 553 ("we cannot imagine a more unambiguous statement of intent [by insurers to not restrict the exclusion to industrial pollution] than, after being told by the courts that 'land, atmosphere, and water course' imply industrial pollution, to replace such language with 'premises you own, rent, or occupy'"). Other courts have found that the change did not effect coverage. *See Sphere Drake Ins. Co. v. Y.L. Realty Co.*, 990 F.Supp. 240, 244 (S.D.N.Y.1997) (change did not broaden the exclusion to cover contaminants such as lead paint, in part because the "terms of art"—"discharge, dispersal, release, or escape" remained); *Sullins*, 667 A.2d at 622–23 (no change in meaning with the deletion of the phrase "into or upon land, the atmosphere or any watercourse or body of water" as the phrase was "merely redundant" in light of the continued use of the environmental "terms of art"). We must read these cases in the shadows of *Royal*, where the court rejected the terms-of-art approach and further found that the change in the language of the object acted upon by a

---

**5.** To the extent that *Royal* defines pollutant in part by the policy's description of the object polluted, it refutes appellant's argument that the issue is resolved by looking to the dictionary and thereby concluding that the substance in question must contaminate the soil, air, or water—objects the dictionary identifies as entities acted upon by pollutants—to qualify as a pollutant.

pollutant had a significant effect on the scope of the exclusion. *See* 517 N.W.2d at 893 (injury from asbestos fibers in a building not excluded by policy containing the "into or upon * * * the atmosphere" language, but excluded under excess policy that used the word "air" instead of "atmosphere").

We observe that in applications of *Royal* there must be a limit to the construction of what constitutes an irritant or contaminant, or the exclusion renders the policy illusory. The argument has been made that virtually any substance can be an "irritant" or a "waste product" under certain circumstances, including for example scalding water coming out of a faucet, spoiled food, and trash on a stairway. *Oates*, 597 N.Y.S.2d at 553. We are satisfied that lead paint does not fall into this category of examples, and that giving effect to the policy language under which lead in paint qualifies as a pollutant does not render the policy illusory. *See id.*

It has also been observed that the insurer could have specifically excluded lead paint from coverage. *See Sphere*, 990 F.Supp. at 244. But it is evident that a failure to specify asbestos was not fatal or dispositive to the insurer's claim in *Royal*. 517 N.W.2d at 893–94 (no specification of asbestos and finding that general pollution exclusion provision in the excess policies excluded coverage).

### 2.

■ Having determined that lead in paint is a pollutant within the policy's definition, we also examine whether the alleged bodily injury "resulted from the actual or threatened discharge, release, escape, seepage, migration, or dispersal of" the lead in the paint chips. The cases specifically addressing whether injury from lead in paint falls under the "absolute pollution exclusion" rarely address this question separately from what qualifies as a pollutant. Those that do are primarily the cases that interpret the exclusion from a technical, "terms of art" in environmental law point of view. *See Sphere*, 990 F.Supp. at 243; *Weaver*, 674 A.2d at 977–78; *Generali–U.S. Branch*, 612 N.Y.S.2d at 299.

Assuming that we should address the issue separately, we conclude that under the ordinary meaning of the terms, the chipping and flaking of lead paint qualifies as a "discharge," "dispersal," or "release." *See Chubb*, 942 F.Supp. at 954 (acknowledging that this is a plausible reading of the exclusion and citing *Oates*, *St. Leger*, and *Kaytes*, before determining that the language is ambiguous because there is also the "terms of art" interpretation). In terms of ordinary meaning, we are unable to find a significant distinction of injury arising from ingestion of dispersed lead paint by way of eating, as opposed to other forms of ingestion. *See St. Leger*, 870 F.Supp. at 642–43 (whether result of "ingestion and/or inhalation" immaterial to determination that injury arose out of dispersal of pollutant); *Peace*, 573 N.W.2d at 200 (finding no distinction between a child ingesting lead from a painted surface and a child ingesting lead from paint released from the surface in the form of chips, flakes and dust); *cf. Generali–U.S. Branch*, 612 N.Y.S.2d at 299 (court unconvinced that lead poisoning sustained by eating paint chips qualified as arising out of a discharge or release of a pollutant).

Nor do we attach significance to the fact that lead in paint affixed to the wall and not released might not be harmful and thus not considered a pollutant. *See Peace*, 573 N.W.2d at 202, (Fine, J., dissenting) (it is a rare substance that is always a pollutant because even the most noxious materials have their appropriate, non-polluting uses). It is not so much less a pollutant as it is then a pollutant in a dormant state. *See id.*

Some observe that there must be consistency, such that if lead in paint is not a pollutant in its stationary form, then it cannot be a pollutant when it is released or digested. *See Bourbeau*, 49 F.3d at 789 (stating that lead poisoning caused by lead paint in a house was outside the exclusion because a reasonable person would not ascribe the word "pollution" to the presence of lead paint in a house). This is evidently comparable to an observation that because gas in an underground tank is not a pollutant, the gas is not a pollutant when it seeps into the ground. We find no merit in this distinction and find that lead in paint is a pollutant under the policy definition, al-

though it may not be harmful until dispersed and ingested.

### DECISION

Bodily injury caused by ingestion of lead from paint applied in a residence falls within the policies' so-called "absolute pollution exclusions." The trial court did not err in granting respondent's motion for a declaratory judgment.

**Affirmed.**