# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-2595

_____

| | |
|---|---|
| United Fire & Casualty Company, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Fidelity Title Insurance Company, | * |
| | * |
| Defendant, | * |
| | * |
| Lawyers Title Insurance Corporation, | * |
| | * |
| Defendant - Appellant. | * |

_____

No. 00-2596

_____

Appeals from the United States
District Court for the
District of Minnesota

| | |
|---|---|
| United Fire & Casualty Company, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Fidelity Title Insurance Company, | * |
| | * |
| Defendant - Appellant, | * |
| | * |

Lawyers Title Insurance Corporation,      *

                                      *

              Defendant.              *

_____

Submitted:  March 14, 2001

Filed:  July 16, 2001
_____

Before BYE, LAY, and JOHN R. GIBSON, Circuit Judges.
_____

BYE, Circuit Judge.

This appeal raises a question of Minnesota law: whether a Notice of Adverse Claim, filed pursuant to Minn. Stat. § 508.70 against a registered Torrens property, should be considered a "defect in title" under the plain and ordinary meaning of that term.  The district court[1] held that a title insurance agent's knowledge of the Notice of Adverse Claim triggered an exclusion in his errors and omissions (E&O) policy which precluded coverage for a claim brought against the agent by a title insurer.  We affirm.

**BACKGROUND**

A 45-acre hobby farm in Hennepin County, Minnesota, is the genesis of this insurance coverage dispute.  The hobby farm is registered Torrens property.[2]  Myrna

---

[1]The Honorable David S. Doty, Senior United States District Judge for the District of Minnesota.

[2]Torrens refers to a real estate titling system under which ownership is initially established by registering for a certificate of title through court proceedings.  Any post-registration disputes are also resolved in court.  The Torrens system contrasts with the

Lysne began renting the hobby farm in 1993. She ran an Arabian horse-boarding operation on the property, and soon needed money to keep her business afloat. She obtained a $40,000 loan from Rockford State Bank (Rockford), securing the loan with money she claimed she would receive as the beneficiary of a family trust fund. Rockford made the original loan due and payable by February 11, 1995, but later gave Lysne several extensions and even loaned her additional money.

In December 1995, Lysne used part of her Rockford funds to purchase the hobby farm under a contract for deed. Lysne never recorded the deed, however, so the world at large had no notice of her interest in the property. Later, Lysne became delinquent in her Rockford loan commitments, which had increased substantially from the original $40,000. In late February 1996, Rockford insisted that Lysne give the bank a $249,395.01 mortgage on the property, and she did so.

A couple months later, Lysne decided to pay the contract for deed in its entirety. She applied for a another loan through a mortgage broker. In her loan application, she disclosed her Rockford loan commitments, but only as a liability being "paid by trust account" and not as an encumbrance upon the property. The mortgage broker sent Lysne's application to Southern Pacific Mortgage Company (Southern). Southern approved the loan and arranged to have Richard Jacobsen, operating as Fidelity Title Insurance Company (Fidelity), and acting as an agent for Lawyers Title Insurance Corporation (Lawyers Title), provide closing and title insurance services.

---

abstract system, which allows for voluntary registration of interests in real estate without requiring an initial court proceeding, and where all the conveyances, interests, liens, and encumbrances that affect title are summarized on an abstract. Compare Minn. Stat. ch. 508 (governing the registration of Torrens property) with Minn. Stat. ch. 508A (governing abstract property).

When Jacobsen performed his initial title search, neither Lysne's contract for deed, nor the Rockford mortgage, appeared in the chain of title. Shortly thereafter, Rockford learned that Lysne had not recorded her contract for deed. Rockford filed a Notice of Adverse Claim pursuant to Minn. Stat. § 508.70[3] to give notice of its mortgagee's interest in the property. Despite the fact that the underlying contract for deed had not been recorded, Hennepin County accepted and filed Rockford's Notice on May 14, 1996.

Jacobsen learned of the Notice of Adverse Claim on June 10, 1996, prior to the closing on the Southern loan. Jacobsen contacted Lysne and her real estate agents, who contested the validity of the Notice. Lysne denied giving Rockford a mortgage on the property. Jacobsen also contacted an attorney for advice. The attorney agreed to initiate a "proceeding subsequent to initial registration," see Minn. Gen. R. Prac. 213, to remove the Notice. Jacobsen arranged to have $5000 of the Southern loan proceeds

---

[3]The statute provides, in relevant part, that

> [a]ny person claiming any right, title, or interest in registered land adverse to the registered owner arising subsequent to the date of the original registration, may, if no other provision is made in this chapter for registering the same, file with the registrar a verified statement in writing setting forth fully the alleged right or interest, and how or from whom it was acquired, and a reference to the volume and page of the certificate of title of the registered owner, together with a description of the land, the adverse claimant's residence, and designating a place at which all notices may be served upon the adverse claimant. Such statement shall be entitled to registration as an adverse claim, and the court, upon the petition of any party in interest, shall grant a speedy hearing upon the validity of such adverse claim and enter such decision and decree therein as justice and equity may require.

Minn. Stat. § 508.70, subd. 1.

set aside in escrow to pay the attorney's fees necessary to conduct the "proceeding subsequent."

Based upon his conversations with Lysne, the realtors, and the attorney, and upon his own understanding of the Torrens statute, Jacobsen did not believe that the Notice of Adverse Claim would give Rockford's mortgage priority over Southern's mortgage. Jacobsen left a message with Lawyers Title about Rockford's adverse claim, and asked if he should proceed with closing. When no one from Lawyers Title contacted him, Jacobsen closed the loan and issued a final title insurance policy, on behalf of Lawyers Title, without excepting the Rockford mortgage.

Much to Jacobsen's surprise, in the proceedings that followed, a title examiner declared Rockford's mortgage valid and superior to Southern's mortgage.[4] Thus,

---

[4]We question the title examiner's decision, since it appears that Hennepin County shouldn't have filed the Notice of Adverse Claim. See Op. Atty. Gen. 374f, January 24, 1957 (holding that Hennepin County should not receive or file an adverse claim of a person holding a mortgage under an unrecorded contract for deed unless and until ordered by a court to do so); Op. Atty. Gen. 374f, October 23, 1963 (holding that Anoka County may not record a mortgage deed as an adverse claim under Minn. Stat. § 508.70 until the underlying contract for deed upon which the mortgage is based has been recorded).

The title examiner didn't consider these attorney general opinions, see Billigmeier v. Hennepin County, 428 N.W.2d 79, 81-82 (Minn. 1988) (holding that attorney general opinions, while not binding, are entitled to careful consideration, especially when long-standing), or a Minnesota Court of Appeals decision consistent with the attorney general opinions. See Fingerhut Corp. v. Suburban Nat'l Bank, 460 N.W.2d 63, 66 (Minn. Ct. App. 1990) (holding that Notice of Adverse Claim provision can't be utilized if "[an]other provision is made in this chapter for registering [an adverse claim]," and that Minn. Stat. § 508.48, which allows a lis pendens to be filed against a registered property, is such a provision).

The parties didn't appeal the title examiner's decision, however, and the validity of that decision matters not for our purposes.

Lawyers Title suddenly found itself obligated to pay a substantial sum (about $365,000) in order to give Southern priority on its mortgage. Lawyers Title immediately sought indemnity from Jacobsen/Fidelity. They, in turn, looked to United Fire and Casualty Company (United), their E&O carrier, to provide coverage. United denied coverage, and filed this declaratory judgment action. United moved for summary judgment, relying upon an exclusion in the E&O policy that applied "to claims arising from defects in title of which the Named Insured had knowledge at the date of issuance of such title insurance."

In a well-reasoned opinion, the district court discussed the plain and ordinary meaning of the term "defect" (since the policy did not define the term), as well as the meaning given to that term by Minnesota courts. The district court concluded that the Notice of Adverse Claim constituted a "defect" because the adverse claim could only be removed by litigation, even if it was invalid. Because Jacobsen knew about the Notice of Adverse Claim when he issued the title insurance, the district court held that the exclusion applied, and granted United's motion for summary judgment. Both Fidelity and Lawyers Title filed timely appeals.

## DISCUSSION

We review the district court's grant of summary judgment de novo, applying the same standard as the district court. See Krentz v. Robertson Fire Protection Dist., 228 F.3d 897, 902 (8th Cir. 2000). Interpretation of the contractual provisions of an insurance policy presents a question of law we review de novo. See Noran Neurological Clinic, P.A. v. Travelers Indem. Co., 229 F.3d 707, 709 (8th Cir. 2000).

Under Minnesota law, undefined terms in an insurance policy are given their plain, ordinary or popular meaning. See Smith v. St. Paul Fire & Marine Ins. Co., 353 N.W.2d 130, 132 (Minn. 1984). United argues that a "defect in title" includes a Notice of Adverse Claim, because the Notice can only be removed by litigation. See Minn. Stat. § 508.70. United ventures that the plain, ordinary and popular meaning of the term "defect" has a broad sweep that encompasses all imperfections of title, whether claimed or actual. Thus, an adverse claim that can only be removed by litigation, even though lacking in merit, still constitutes a "defect."

Lawyers Title and Fidelity counter that such a broad definition of the term would defeat the reasonable expectations of the insured, and render the E&O coverage completely illusory. The appellants argue that while Jacobsen knew the Notice was a "cloud" on title, or *potential* defect, he did not know or believe that it constituted an *actual* defect. The appellants contend that the purpose of the E&O policy was to provide coverage when an agent makes a mistake in judgment about a potential defect that is later deemed to be an actual defect.

We agree with United. The plain and ordinary meaning of "defect" is broad, referring to any "fault or shortcoming or failing; imperfection. . . . Defect is the general word for any kind of shortcoming, imperfection, or deficiency, whether hidden or visible." Random House Webster's College Dictionary 347 (2d ed. 1999). While courts use many terms to describe flawed titles, and the various types of flaws in title, (i.e., "cloud on title," "encumbrance," "defective title," "unmarketable title") the term "defect" itself is typically used in a broader sense that encompasses all the other terms. See, e.g., State Bank of Good Thunder v. Bryson, 262 N.W. 561, 561-62 (Minn. 1935) (referring to "defect" in general terms when discussing a title that "might or might not be good"); Maeser v. Cook, Vogele & Nelson, P.A., 446 N.W.2d 697, 698 (Minn. Ct. App. 1989) ("A title that may force the purchaser into litigation to remove defects is not a marketable title."); Tara Hills Condo. Ass'n v. Gaughan, 399 N.W.2d 638, 643

(Minn. Ct. App. 1987) (referring to "defects" as those both real and apparent that affect marketability); <u>Simon Home Builders, Inc. v. Pailoor</u>, 357 N.W.2d 383, 385 (Minn. Ct. App. 1984) (equating "defect" and "cloud" — "The *'defect'* in title relating to the attorney's lien did not cause [appellant's] breach.  Even if the attorney's lien did constitute a *cloud* on title, it was not material.") (emphasis added); <u>see also</u> <u>Stewart Title Guar. Co. v. Greenlands Realty</u>, 58 F. Supp. 2d 370, 382 (D.N.J. 1999) (holding that "defects" can be so minimal or trivial that they do not even rise to the level of a "defect" that renders title unmarketable); Annot., <u>Defects Affecting Marketability of Title</u>, 18 A.L.R.4th 1311, 1313 (defining "defect" in terms broader than those aspects of a title that render it unmarketable — "It may perhaps be stated that as a general rule discernible from the cases discussed herein, defects which merely diminish the value of the property, as opposed to defects which adversely affect a clear title to the property, will not render title unmarketable within the meaning and coverage of a policy insuring against unmarketable title.")

Therefore, we conclude that the plain and ordinary meaning of "defect" includes a claim against title that, regardless of validity, might force a person into litigation. <u>E.g.</u>, <u>Maeser</u>, 446 N.W.2d at 698.  Jacobsen knew that the Notice of Adverse Claim could only be removed by litigation, since he set aside $5000 in escrow to pay for attorney's fees necessary to conduct the litigation.  In addition, he knew about the Notice at the time he issued the title insurance policy.  Therefore, the exclusion for "claims arising from defects in title of which the Named Insured had knowledge at the date of issuance of such title insurance" applies.

We disagree with appellants' contention that interpreting the policy in this manner renders the E&O coverage illusory.  The doctrine of illusory coverage applies only when "part of the premium is specifically allocated to a particular type or period of coverage and that coverage turns out to be functionally nonexistent." <u>Jostens, Inc. v. Northfield Ins. Co.</u>, 527 N.W.2d 116, 119 (Minn. Ct. App. 1995).  That is not the

case here. The E&O policy clearly provided coverage under many circumstances. If, for example, Jacobsen had neglected to discover Rockford's Notice of Adverse Claim prior to the closing date, his negligent lack of knowledge would not have triggered the exclusion. But the policy was not meant to provide coverage for *known* defects in title, and Fidelity never paid a premium for such coverage. See Kabanuk Diversified Inv., Inc. v. Credit Gen. Ins. Co., 553 N.W.2d 65, 73 (Minn. Ct. App. 1996) (refusing to apply the doctrine of illusory coverage absent evidence that a premium was specifically allocated to the disputed coverage).

We also disagree that a broad definition of the term "defect" defeats the reasonable expectations of the insured. Since the term "defect" was undefined in the policy, Jacobsen could not reasonably expect that the term would be given a narrower, technical meaning that differed from its plain and ordinary meaning. See Auto-Owners Ins. Co. v. Hanson, 588 N.W.2d 777, 779-80 (Minn. Ct. App. 1999) (explaining that Minnesota rejects a "terms of art" approach to interpreting undefined terms in an insurance policy). When understood in its plain and ordinary meaning, "the language in this policy was not ambiguous and appellant[s] made no showing of a hidden exclusion or other special circumstances, [and therefore] the [district] court correctly refused to apply the doctrine of reasonable expectations." Levin v. Aetna Cas. & Sur. Co., 465 N.W.2d 99, 102 (Minn. Ct. App. 1991).

We affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.