THE CINCINNATI INSURANCE COMPANY, APPELLEE, V.
BECKER WAREHOUSE, INC., AND BECKER
TRANSPORTATION, INC., APPELLANTS.
635 N.W.2d 112

Filed November 2, 2001.   No. S-00-767.

Eugene P. Welch and Francie C. Riedmann, of Gross & Welch, P.C., for appellants.

Robert T. Grimit and Jarrod S. Boitnott, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellee.

HENDRY, C.J., WRIGHT, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## NATURE OF CASE

Becker Warehouse, Inc., and Becker Transportation, Inc. (collectively Becker), own a warehouse where food products owned by various entities are stored. While constructing an addition to Becker's warehouse, Stoetzel & Son, Inc., applied a sealant called Kure-N-Seal to the concrete floor. The owners of the food products filed lawsuits against Becker alleging that xylene fumes from the Kure-N-Seal contaminated their food products. Becker sought indemnity and defense from its insurer, the appellee, The Cincinnati Insurance Company (Cincinnati). Cincinnati filed a petition for declaratory judgment in the district court, seeking a declaration that Becker's insurance policy does not provide coverage for the alleged contamination and that Cincinnati has no obligation to defend Becker. Both parties filed motions for summary judgment; the district court sustained Cincinnati's motion and overruled Becker's. Because Cincinnati's insurance policy is not ambiguous and excludes coverage for Becker's claim, we affirm the district court's judgment in favor of Cincinnati.

## FACTUAL BACKGROUND

In 1997, Becker and Stoetzel & Son entered into a contract under which Stoetzel & Son was to build an addition to Becker's warehouse in Hastings, Nebraska. Becker used the warehouse to store food products and ingredients owned by various entities, including Swift-Eckrich, Inc., doing business as Armour Swift Eckrich (Armour); Newly Weds Foods, Inc.; and J.M. Swank Company, a division of ConAgra, Inc. (Swank). While constructing the warehouse addition, Stoetzel & Son applied a concrete sealant called Kure-N-Seal.

Kure-N-Seal's material safety data sheet indicates that it contains xylene, poses an immediate and chronic health hazard, and

should be used with proper respiratory protection when applied in poorly ventilated areas. The federal Clean Air Act, 42 U.S.C. § 7412(b) (1994), lists xylene as a hazardous air pollutant. The Kure-N-Seal label and advertisement state that "[i]f Kure-N-Seal is applied in or near areas containing foodstuffs, they should be removed before application and until Kure-N-Seal has fully dried and all solvent vapors have dissipated." The label and advertisement also state:

> Heating Ventilation Air Conditioning (HVAC) units may draw [Kure-N-Seal] solvent vapors into occupied building interiors. Solvent vapors can be irritating to people unaccustomed to the odor; do not apply Kure-N-Seal in or around buildings occupied by nonconstruction personnel without consulting building management. Use only with adequate ventilation and with a minimum of 6 air changes per hour.

According to Becker, Stoetzel & Son failed to properly ventilate the warehouse while applying the Kure-N-Seal. Scott Stoetzel, an employee who applied the Kure-N-Seal, testified in a deposition that he wore a respirator during application of the Kure-N-Seal because he applied it in an enclosed building that needed ventilation.

Scott Stoetzel testified that Kure-N-Seal might have been safely applied without a mask, but he "wouldn't want to try it." Scott Stoetzel and another Stoetzel & Son employee opened doors, installed fans, and hung plastic sheeting to ventilate the area treated with Kure-N-Seal and to prevent the fumes from spreading. Several days after the Kure-N-Seal application, both Scott Stoetzel and Brian Becker, the warehouse company's owner and chief executive officer, noticed an odor of the Kure-N-Seal in the warehouse area where food products were stored. Subsequently, Scott Stoetzel and Brian Becker attempted to better ventilate the warehouse until the odor dissipated.

Armour and Swank filed lawsuits against Becker, alleging that xylene fumes from the Kure-N-Seal damaged their food products stored in Becker's warehouse at the time of the Kure-N-Seal application. Subsequently, Becker filed insurance claims with Cincinnati, seeking indemnity and defense against Armour and Swank's allegations. Cincinnati denied Becker's claims and refused to defend Becker in the pending lawsuits.

Cincinnati filed a petition for declaratory judgment in district court, seeking a declaration that its policy does not cover matters arising out of Stoetzel & Son's use of Kure-N-Seal in the Becker warehouse and that it has no obligation to defend actions filed by others against Becker. Becker filed a counter/cross-claim, alleging that Cincinnati has a duty to indemnify Becker's damages from the use of Kure-N-Seal and to provide a defense to the pending litigation against Becker. Becker also alleged that Kure-N-Seal is not a pollutant within the meaning of the insurance policy issued by Cincinnati.

The commercial general liability (CGL) insurance policy issued to Becker by Cincinnati excludes from coverage, in pertinent part:

**f. Pollutant**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

. . . .

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

(i) If the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor . . . .

. . . .

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed. Pollutants include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment.

. . . .

**j. Damage to Property**

"Property damage" to:

. . . .

**(4)** Personal property in the care, custody or control of an insured.

The building and personal property coverage form of the commercial property coverage part of the insurance policy issued to Becker by Cincinnati states, in pertinent part:

### A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the following types of property for which a Limit of Insurance is shown in the Declarations:

. . . .

**b.** Your Business Personal Property and Personal Property of Others in your care, custody and control located in or on the building described in the Declarations

. . . .

The causes of loss—special form as shown in the declarations and referred to above provides the following relevant exclusion for the commercial property coverage part:

### B. EXCLUSIONS

. . . .

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

. . . .

**1.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if loss or damage by the "specified causes of loss" results, we will pay for the resulting damage caused by the "specified causes of loss."

The policy defines "Specified Causes of Loss" as "Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire

extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage."

Becker and Cincinnati both moved for summary judgment in the district court. The district court found that the insurance policy in question contained an absolute pollution exclusion which, as a matter of law, was not ambiguous and should be construed under its plain meaning. The district court also found that the xylene fumes emitted in Becker's warehouse constituted a pollutant within the meaning of the policy, creating damage arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants. Further, the court determined that damage to Swank's and Armour's property in the care, custody, and control of Becker was excluded from coverage by the pollution exclusion in the policy. Therefore, the district court concluded that Becker's damages were excluded from coverage under the insurance policy and that Cincinnati had no duty to defend. The district court sustained Cincinnati's motion for summary judgment and denied Becker's motion for summary judgment. Becker appealed, and we moved the case to our docket pursuant to our authority to regulate the dockets of the appellate courts.

## ASSIGNMENTS OF ERROR

Becker assigns, restated, that the district court erred in (1) finding that the pollution exclusion contained in the insurance policy issued by Cincinnati is not ambiguous; (2) finding that the pollution exclusion applied to the claims filed against Becker and not just to environmental claims; (3) finding that xylene was a pollutant within the language of the policy; (4) finding that the chemicals contained in the floor sealant were "discharged, dispersed, migrated or released"; (5) finding that the conflicting provisions regarding the "care, custody and control" provision in the policy were not ambiguous; (6) finding that the claims against Becker are excluded by the "care, custody and control" provision contained in the policy; and (7) sustaining Cincinnati's motion for summary judgment and overruling Becker's motion for summary judgment. Additionally, Becker argues that the district court did not have

subject matter jurisdiction over Cincinnati's petition for declaratory judgment.

## STANDARD OF REVIEW

■ The construction of a contract is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determinations made by the court below. *Strategic Staff Mgmt. v. Roseland*, 260 Neb. 682, 619 N.W.2d 230 (2000).

## ANALYSIS

### SUBJECT MATTER JURISDICTION

■ First, we must determine if the district court had subject matter jurisdiction over Cincinnati's declaratory judgment action. The absence of subject matter jurisdiction may be raised at any time by any party or by the court sua sponte. *Creighton St. Joseph Hosp. v. Tax Eq. & Rev. Comm.*, 260 Neb. 905, 620 N.W.2d 90 (2000). Becker argues that because Swank's and Armour's lawsuits against Becker have not yet established that their products were contaminated by the xylene used in Becker's warehouse, the district court did not have jurisdiction over the declaratory judgment action filed by Cincinnati. A declaratory judgment action cannot be used to determine the legal effects of a set of facts which are future, contingent, or uncertain. *Medical Protective Co. v. Schrein*, 255 Neb. 24, 582 N.W.2d 286 (1998).

Becker, citing *Allstate Ins. Co. v. Novak*, 210 Neb. 184, 313 N.W.2d 636 (1981), asserts that an insurer has a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy. In *Novak*, the insured sought defense from his insurance company for assault and battery allegations brought against him. The insurance policy in *Novak* excluded coverage for bodily injury that the insured either expected or intended, such as intentional torts like assault and battery. Bodily injury, however, was clearly covered by the policy in *Novak*, and the pending case against the insured would have determined whether or not the injury was intentional. Thus, this court found that until the facts were resolved, we could not determine the insurance company's obligation to pay and could not, therefore, grant a declaratory judgment on that question. *Id.*

■ Here, however, the duty to defend is bound up in whether or not Cincinnati's policy covers Becker's potential damages. In *Novak, supra,* the insured's damages were covered if his acts were not intentional. But here, Becker is arguing only that Cincinnati's policy is ambiguous. Whether the language in an insurance policy is ambiguous presents a question of law. *American Family Ins. Group v. Hemenway,* 254 Neb. 134, 575 N.W.2d 143 (1998). *Novak, supra,* turned on facts; this case turns on law. If Cincinnati's policy does not provide coverage for Becker's damages in the Kure-N-Seal incident, there is no duty for Cincinnati to provide a defense for Becker in the pending lawsuits. Therefore, the district court had subject matter jurisdiction over the declaratory judgment, and we proceed to consider the substantive issues in this appeal.

### POLLUTION EXCLUSION

Becker alleges that the pollution exclusion contained in Cincinnati's policy is ambiguous. In support of this claim, Becker argues that (1) the pollution exclusion applies to only traditional environmental pollution claims and (2) applying the pollution exclusion to the claims against Becker violates Becker's reasonable expectations as an insured. The question of the ambiguity of this type of pollution exclusion is an issue of first impression in Nebraska. State and federal courts are split on whether an insurance policy's absolute pollution exclusion bars coverage for all injuries caused by pollutants or whether it applies only to injuries caused by traditional environmental pollution. A majority of state and federal jurisdictions have held that absolute pollution exclusions are unambiguous as a matter of law and, thus, exclude coverage for all claims alleging damage caused by pollutants. See, *Nat'l Elect. Mfrs. v. Gulf Underwriters Ins.,* 162 F.3d 821 (4th Cir. 1998) (applying D.C. law); *Technical Coating v. U.S. Fidelity & Guaranty,* 157 F.3d 843 (11th Cir. 1998) (applying Florida law); *Certain Underwriters at Lloyd's v. C.A. Turner Const.,* 112 F.3d 184 (5th Cir. 1997) (applying Texas law); *American States Ins. Co. v. Nethery,* 79 F.3d 473 (5th Cir. 1996) (applying Mississippi law); *Brown v. American Motorists Ins. Co.,* 930 F. Supp. 207 (E.D. Pa. 1996); *City of Salina, Kan. v. Maryland Cas. Co.,* 856 F.

Supp. 1467 (D. Kan. 1994); *Madison Const. v. Harleysville Mut. Ins.*, 557 Pa. 595, 735 A.2d 100 (1999); *Deni Associates v. State Farm Ins.*, 711 So. 2d 1135 (Fla. 1998); *Truitt Oil &c. v. Ranger Ins. Co.*, 231 Ga. App. 89, 498 S.E.2d 572 (1998); *City of Bremerton v. Harbor Ins. Co.*, 92 Wash. App. 17, 963 P.2d 194 (1998); *Terramatrix, Inc. v. U.S. Fire Ins. Co.*, 939 P.2d 483 (Colo. App. 1997).

Becker, however, argues that the pollution exclusion is ambiguous and should be applied to only environmental pollution claims. In support of his argument, Becker refers us to authority in a number of other jurisdictions. Representative of the cases upon which Becker relies is *American States Ins. Co. v. Koloms*, 177 Ill. 2d 473, 687 N.E.2d 72, 227 Ill. Dec. 149 (1997), wherein the Illinois Supreme Court found that a similar pollution exclusion excluded coverage for only traditional environmental damages. The *Koloms* court based its reasoning on the evolution and purpose of the pollution exclusion rather than on a plain reading of the exclusion. The court in *Koloms* acknowledged that

[a] close examination of this [pollution exclusion] language reveals that the exclusion (i) identifies the types of injury-producing materials which constitute a pollutant . . . (ii) sets forth the physical or elemental states in which the materials may be said to exist . . . and (iii) specifies the various means by which the materials can be disseminated . . . . To that extent, therefore, the exclusion is indeed "quite specific," and those courts wishing to focus exclusively on the bare language of the exclusion will have no difficulty in concluding that it is also unambiguous.

177 Ill. 2d at 487, 687 N.E.2d at 79, 227 Ill. Dec. at 156. Despite the plain meaning of the policy language, the court held:

Our review of the history of the pollution exclusion amply demonstrates that the predominate motivation in drafting an exclusion for pollution-related injuries was the avoidance of the "enormous expense and exposure resulting from the 'explosion' of *environmental* litigation." . . . We would be remiss, therefore, if we were to simply look at the bare words of the exclusion, ignore its *raison d' être*, and apply it to situations which do not remotely resemble traditional environmental contamination. The pollution

exclusion has been, and should continue to be, the appropriate means of avoiding " 'the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances *into the environment.*' " . . . We think it improper to extend the exclusion beyond that arena.

(Emphasis in original.) *Id.* at 492-93, 687 N.E.2d at 81, 227 Ill. Dec. at 158.

We, however, find it unnecessary and inappropriate to look beyond the "bare words of the exclusion" as the court in *Koloms* did. The pollution exclusion in Cincinnati's CGL policy reads, in pertinent part:

**f. Pollutant**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

. . . .

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed. Pollutants include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment.

Under Nebraska law, a court interpreting a contract, such as an insurance policy, must first determine, as a matter of law, whether the contract is ambiguous. *Tighe v. Combined Ins. Co. of America,* 261 Neb. 993, 628 N.W.2d 670 (2001). Appellate review of an insurance policy must construe the policy as any other contract and give effect to the parties' intentions at the time the contract was made. Where the terms of an insurance contract are clear, they are to be accorded their plain and ordinary meaning. *Austin v. State Farm Mut. Auto. Ins. Co.,* 261 Neb. 697, 625 N.W.2d 213 (2001).

We conclude that as a matter of law, Cincinnati's pollution exclusion, though quite broad, is unambiguous. The language of the policy does not specifically limit excluded claims to

traditional environmental damage; nor does the pollution exclusion purport to limit materials that qualify as pollutants to those that cause traditional environmental damage. The definition of "pollutant" in Cincinnati's CGL policy includes substances that are "harmful or toxic to persons, property or the environment." By including "the environment" as a separate entity that could suffer harm from a pollutant, the pollution exclusion does not limit its scope of application to environmental pollution. An occurrence such as the release of xylene fumes in Becker's warehouse clearly falls under Cincinnati's broad exclusion—to find otherwise would read meaning into the policy that is not plainly there. The language of an insurance policy should be read to avoid ambiguities, if possible, and the language should not be tortured to create them. *Austin v. State Farm Mut. Auto. Ins. Co., supra; Shivvers v. American Family Ins. Co.*, 256 Neb. 159, 589 N.W.2d 129 (1999).

Other courts, as cited above, have found pollution exclusions to be unambiguous as a matter of law. The 11th Circuit, applying Florida law, held that "absolute pollution exclusions contained in the policies issued by [the insurer] unambiguously excluded coverage for bodily injuries sustained by breathing vapors emitted from [the insured's] roofing products, regardless of whether [the insured] used the products properly or negligently." *Technical Coating v. U.S. Fidelity & Guaranty*, 157 F.3d 843, 846 (11th Cir. 1998). The court in *Brown v. American Motorists Ins. Co.*, 930 F. Supp. 207, 209 (E.D. Pa. 1996), stated:

> The best manifestation of the intent of the parties is the clear and unambiguous language of the policy. . . . Plaintiffs have not identified any ambiguity in the language . . . and none is apparent to the Court. . . . Accordingly, the Court declines to look to, or speculate on, the intent of the parties in an attempt to avoid the plain meaning of policy language.

(Citations omitted.) In *Brown, supra*, as in the instant case, there were no specific instances of ambiguous language identified by the insurance claimant, but instead a mere allegation of ambiguity, which is not enough to sustain a conclusion of ambiguity under Nebraska's insurance policy interpretation laws. The broad nature of the pollution exclusion may cause a commercial client to question the value of portions of its commercial general

liability policy, but, as an appellate court reviewing terms of an insurance contract, we cannot say that the language of the pollution exclusion is ambiguous in any way. The language in the instant pollution exclusion is clear and susceptible of only one possible interpretation.

Becker argues that the absolute pollution exclusion violates its reasonable expectations as an insured. Under Nebraska law, however, the reasonable expectations of an insured are not assessed unless the language of the insurance policy is found to be ambiguous. When the terms of the contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them. *Moller v. State Farm Mut. Auto. Ins. Co.*, 252 Neb. 722, 566 N.W.2d 382 (1997). As stated above, the terms of Cincinnati's insurance policy are clear; therefore, the policy is not subject to further interpretation or construction beyond its plain and ordinary meaning. Becker's reasonable expectations are not taken into consideration in light of an unambiguous policy to which it has agreed. Cincinnati's pollution exclusion, though quite broad, is not ambiguous.

## XYLENE AS POLLUTANT

The district court found that xylene qualified as a pollutant within the definition of the Cincinnati insurance policy issued to Becker. Becker argues that based on an identical definition of "pollutant" used by an insurance policy in *West American Insurance Co. v. Tufco Flooring East*, 104 N.C. App. 312, 409 S.E.2d 692 (1991), *overruled on other grounds, Gaston County Dyeing Machine Co. v. Northfield Ins. Co.*, 351 N.C. 293, 524 S.E.2d 558 (2000), the xylene in Kure-N-Seal does not constitute a "pollutant" under the Cincinnati policy. In that case, Tufco Flooring East, a floor resurfacing company, sought indemnification and defense from West American Insurance for its alleged contamination of chicken products of Perdue Farms, Inc., with styrene, a resurfacing chemical. The court found that under West American's insurance policy, styrene was not a "pollutant" under the pollution exclusion clause, because

> Tufco did not bring the *vapors* or *fumes* which invaded the chicken to the Perdue plant. Rather, Tufco brought an

unadulterated, pure raw material, styrene monomer resin . . . . When this raw material was brought onto the site, it was neither an "irritant or contaminant." It was a raw material used by Tufco in its normal business activity of resurfacing floors. Yet, to be a "pollutant" under the exclusion, a substance brought onto the site must be precisely that, an "irritant or contaminant."

(Emphasis in original.) *Id.* at 322, 409 S.E.2d at 698.

Becker claims that because Stoetzel & Son brought xylene into the warehouse as pure, unadulterated material to be used in the business activity of resurfacing floors, xylene is not a "pollutant" within the definition of the Cincinnati policy or the holding in *Tufco Flooring East, supra.* Becker also points out that while the food products stored in its warehouse may have been damaged, they were not "polluted," i.e., made toxic from the xylene fumes. Brief for appellant at 31.

We conclude, however, that xylene is indeed a pollutant under the meaning of the Cincinnati insurance policy. The policy defines a pollutant as "any solid, liquid, gaseous or thermal irritant or contaminant," including but not limited to "substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment." The federal Clean Air Act, § 7412(b), lists xylene as a hazardous air pollutant. Merely because the substance is in a different form in the instant case—fumes instead of liquid—does not render xylene a nonpollutant. See, e.g., *American States Ins. Co. v. Technical Surfacing*, 50 F. Supp. 2d 888 (D. Minn. 1999).

Cincinnati urges that in addition to being defined as a pollutant under the federal Clean Air Act, xylene qualifies as a pollutant under the insurance policy because it contaminated the food products in the warehouse. As noted earlier, the Kure-N-Seal label clearly warns that food products should be removed from the area where the sealant is applied until the vapors dissipate. The label also states that the solvent vapors can be "irritating" to those not accustomed to them, which places xylene squarely within the insurance policy's definition of "pollutant" as a "contaminant or irritant." We, therefore, conclude as a matter of law that xylene is a pollutant within the definition of Cincinnati's policy.

DISCHARGE, DISPERSAL, MIGRATION, OR RELEASE

The district court found that the Kure-N-Seal fumes were "discharged, dispersed, migrated or released" in Becker's warehouse, therefore excluding from Cincinnati's insurance policy coverage the alleged damage they caused. Becker argues that within the broader argument regarding the pollution exclusion's ambiguity, the "discharged, dispersed, migrated or released" language further indicates that the pollution exclusion applies to only environmental pollution. *American States Ins. Co. v. Koloms*, 177 Ill. 2d 473, 687 N.E.2d 72, 227 Ill. Dec. 149 (1997), and *West American Insurance Co. v. Tufco Flooring East*, 104 N.C. App. 312, 409 S.E.2d 692 (1991), both found that language similar to the language in Cincinnati's policy indicates that a discharge into the environment is necessary for the pollution exclusion to be applicable.

> The operative policy terms of the pollution exclusion clause imply that there must be a discharge into the environment before coverage can be properly denied. . . . While they are not defined in the policy, the terms "discharge" and "release" are terms of art in environmental law and include "escape" by definition and "dispersal" by concept.

*Tufco Flooring East*, 104 N.C. App. at 324, 409 S.E.2d at 699. Becker also cites the Sixth Circuit's holding that "the total pollution exclusion clause at bar does not shield the insurer from liability for injuries caused by toxic substances that are still confined within the general area of their intended use." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1184 (6th Cir. 1999).

Cincinnati also cites the above quotation from *Kellman, supra*, emphasizing the words "confined within the general area of their intended use" to distinguish the issue in the instant case from *Kellman*. Cincinnati argues that, unlike *Kellman*, 197 F.3d at 1185, "where the injured third party was in the immediate vicinity of the harmful product" and was "harmed . . . within a few feet of the area of [the product's] intended use," the Kure-N-Seal fumes in Becker's warehouse were not confined within the general area of their intended use and, allegedly, harmed products outside the immediate vicinity of use. As noted earlier, Stoetzel & Son applied Kure-N-Seal to the floor of the addition

to Becker's warehouse, not to the immediate area or vicinity where the food products were stored. The treated area was separated from the food storage area with layers of heavy plastic sheeting. Cincinnati claims, and we agree, that the only logical explanation for the alleged damage is that the Kure-N-Seal fumes "discharged, dispersed, released or escaped" from the warehouse addition into the original part of the warehouse where food products were stored.

## CARE, CUSTODY, AND CONTROL

Finally, Becker assigns that the district court erred in finding (1) that the "care, custody and control" exclusion in Cincinnati's policy is unambiguous and (2) that claims against Becker are excluded by the "care, custody and control" exclusion.

Cincinnati's policy contains two coverage segments, the CGL coverage form and the commercial property coverage part. While the CGL coverage form excludes property in the "care, custody and control" of the insured from coverage, the commercial property coverage part, with its building and personal property coverage form, covers property in the "care, custody and control" of the insured. This is not ambiguous, but instead applies to separate aspects of Becker's insurance coverage—the CGL covers liability, and the commercial property coverage refers to Becker's buildings and personal property.

The "care, custody and control" exclusion in the CGL coverage form clearly excludes Becker's damages from coverage. The "care, custody, and control" provision in the commercial property coverage part provides coverage, but subject to the causes of loss—special form. The causes of loss form specifically excludes coverage for "discharge, dispersal, seepage, migration, release or escape of 'pollutants' unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the 'specified causes of loss.' " None of the specified causes of loss, which refer primarily to weather- or nature-related damage, apply to Becker's situation.

Because we have determined that the alleged xylene contamination constitutes pollution, the pollution exclusion in the commercial property coverage part precludes coverage under the "care, custody and control" provision.

## CONCLUSION

Having considered each of Becker's assignments of error, and finding them to be without merit, we affirm the judgment of the district court.

AFFIRMED.

CONNOLLY, J., not participating.