CASES DETERMINED

IN THE

# SUPREME COURT OF NEBRASKA

STATE FARM FIRE & CASUALTY COMPANY, APPELLEE, V. JERRY DANTZLER, APPELLANT, AND DAVID CHUOL, INDIVIDUALLY AND AS FATHER AND NEXT FRIEND TO CHUOL GEIT, AND CHUOL GEIT, APPELLEES.

___ N.W.2d ___

Filed September 12, 2014.    No. S-12-1042.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.
2. **Contracts: Judgments: Appeal and Error.** The meaning of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.
3. **Summary Judgment.** If a genuine issue of fact exists, summary judgment may not properly be entered.
4. ____. Not all issues of fact preclude summary judgment, but only those that are material.
5. ____. In the summary judgment context, a fact is material only if it would affect the outcome of the case.

Petition for further review from the Court of Appeals, MOORE, PIRTLE, and BISHOP, Judges, on appeal thereto from the District Court for Douglas County, KIMBERLY MILLER PANKONIN, Judge. Judgment of Court of Appeals reversed, and cause remanded with direction.

Michael A. Nelsen, of Marks, Clare & Richards, L.L.C., for appellant.

(1)

Patrick S. Cooper and David J. Stubstad, of Fraser Stryker, P.C., L.L.O., for appellee State Farm Fire & Casualty Company.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Wright, J.

## NATURE OF CASE

State Farm Fire & Casualty Company (State Farm) brought an action for declaratory judgment, claiming its rental dwelling policy issued to Jerry Dantzler excluded coverage for personal injuries allegedly sustained by Dantzler's tenant as a result of exposure to lead-based paint. In cross-motions for summary judgment, State Farm and Dantzler requested a determination whether a policy exclusion precluded coverage for the tenant's personal injury claim. The district court sustained State Farm's motion for summary judgment and concluded as a matter of law that the pollution exclusion barred coverage under State Farm's policy.

In *State Farm Fire & Cas. Co. v. Dantzler*,[1] the Nebraska Court of Appeals reversed the entry of summary judgment, concluding that in the absence of proof how the tenant was allegedly exposed to lead-based paint, it could not determine as a matter of law whether the pollution exclusion barred coverage. It reasoned that whether the alleged exposure to lead-based paint occurred through a "discharge, dispersal, spill, release or escape," as specified in the exclusion, was a factual determination that depended upon the manner of exposure.[2] We granted State Farm's petition for further review.

## SCOPE OF REVIEW

[1] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or

---

[1] *State Farm Fire & Cas. Co. v. Dantzler*, 21 Neb. App. 564, 842 N.W.2d 117 (2013).

[2] See *id.*

as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[3]

[2] The meaning of a contract is a question of law, in connection with which an appellate court has an obligation to reach its conclusions independently of the determinations made by the court below.[4]

## FACTS

Dantzler owned a rental property in Omaha, Nebraska. He maintained insurance on the rental property with a rental dwelling policy issued by State Farm. The relevant provisions of the policy stated:

**COVERAGE L - BUSINESS LIABILITY**

If a claim is made or a suit is brought against any **insured** for damages because of **bodily injury, personal injury,** or **property damage** to which this coverage applies, caused by an **occurrence**, and which arises from the ownership, maintenance, or use of the **insured premises**, we will:

1. pay up to our limit of liability for the damages for which the **insured** is legally liable; and

2. provide a defense at our expense by counsel of our choice. . . .

. . . .

**SECTION II - EXCLUSIONS**

1. **Coverage L - Business Liability** [does] not apply to:

. . . .

i. **bodily injury** or **property damage** arising out of the actual, alleged or threatened discharge, dispersal, spill, release or escape of pollutants:

(1) at or from premises owned, rented or occupied by the **named insured**;

. . . .

As used in this exclusion:

. . . .

---

[3] *Potter v. Board of Regents*, 287 Neb. 732, 844 N.W.2d 741 (2014).

[4] *Braunger Foods v. Sears*, 286 Neb. 29, 834 N.W.2d 779 (2013).

> "[P]ollutants" means any solid, liquid, gaseous or ther-
> mal irritant or contaminant, including smoke, vapor, soot,
> fumes, acids, alkalis, chemicals and waste.

(Emphasis in original.) Hereinafter, we refer to the exclusion
relating to pollutants as the "pollution exclusion."

David Chuol (David) and his minor child, Chuol Geit
(Geit), were tenants of Dantzler's rental property. In March
2011, David and Geit sued Dantzler in the Douglas County
District Court, alleging that Geit was exposed to high levels
of lead poisoning due to lead paint contamination within the
rental property. Dantzler tendered the claim to State Farm. It
retained counsel to represent Dantzler but reserved its right to
deny coverage.

State Farm filed an action for declaratory judgment against
Dantzler, David, and Geit. It asked the district court to deter-
mine whether its policy excluded coverage for the lead-based-
paint claim being brought against Dantzler. State Farm and
Dantzler filed cross-motions for summary judgment.

State Farm's affidavit from a chemical toxicologist set forth
common manners of exposure to lead-based paint. The toxi-
cologist did not opine specifically how Geit was allegedly
exposed to lead. Dantzler adduced evidence that he had not
applied the lead-based paint found in the rental property. He
asserted there was no genuine issue of material fact regard-
ing the insurance coverage, because lead-based paint was not
a "pollutant" under the terms of the policy and State Farm
could not prove that Geit's alleged injuries were the result of a
"discharge, dispersal, spill, release or escape of pollutants," as
described in the pollution exclusion.

The district court sustained State Farm's motion for sum-
mary judgment and overruled Dantzler's motion for summary
judgment. Relying on our decision in *Cincinnati Ins. Co. v.
Becker Warehouse, Inc.*,[5] the court determined that lead was
a pollutant as defined in the pollution exclusion and that
such exclusion was not ambiguous. It concluded that Geit

---

[5] *Cincinnati Ins. Co. v. Becker Warehouse, Inc.*, 262 Neb. 746, 635 N.W.2d
112 (2001).

could have been exposed to lead only if it was discharged, dispersed, or released or had escaped from its location. The court found that the pollution exclusion barred coverage for Geit's personal injury claim and that State Farm had no duty to indemnify Dantzler.

Dantzler timely appealed. He assigned that the district court erred in concluding that the pollution exclusion barred coverage of his liability arising from the lead-based-paint claim.

The Court of Appeals concluded that lead found in paint was a pollutant within the meaning of the pollution exclusion but that there was a genuine issue of material fact whether there was a "discharge, dispersal, spill, release or escape," which therefore prevented the entry of summary judgment in favor of State Farm.[6] It reversed the district court's entry of summary judgment and remanded the cause for further proceedings.[7] We granted further review.

## ASSIGNMENTS OF ERROR

On further review, State Farm assigns, restated, that the Court of Appeals erred in (1) deciding that the pollution exclusion was ambiguous; (2) concluding that there was more than one reasonable interpretation of the pollution exclusion; (3) relying upon *Danbury Ins. Co. v. Novella*,[8] instead of *Cincinnati Ins. Co.*[9]; and (4) concluding that there was a question of fact whether Geit was exposed to lead-based paint through a "discharge, dispersal, spill, release or escape," which prevented the entry of summary judgment in favor of State Farm.

## ANALYSIS

[3-5] We are presented with the question whether the manner in which Geit was allegedly exposed to lead-based paint is an issue of material fact that prevents summary judgment

---

[6] See *Dantzler, supra* note 1.

[7] See *id.*

[8] *Danbury Ins. Co. v. Novella*, 45 Conn. Supp. 551, 727 A.2d 279 (1998).

[9] *Cincinnati Ins. Co.*, *supra* note 5.

in favor of State Farm. If a genuine issue of fact exists, summary judgment may not properly be entered.[10] "[N]ot all issues of fact preclude summary judgment, but only those that are material."[11] In the summary judgment context, a fact is material only if it would affect the outcome of the case.[12]

The outcome of this case depends upon whether Geit's alleged injuries were caused by a "discharge, dispersal, spill, release or escape" of lead-based paint such that the pollution exclusion bars coverage. Dantzler's policy excluded coverage for "**bodily injury** or **property damage** arising out of the actual, alleged or threatened discharge, dispersal, spill, release or escape of pollutants . . . at or from premises owned, rented or occupied by [Dantzler]." (Emphasis in original.) The parties do not dispute the Court of Appeals' determination that "lead found in paint"[13] is a pollutant as defined in the pollution exclusion. And there is no dispute that Geit's exposure to lead-based paint was alleged to have occurred on Dantzler's rental property. The application of the pollution exclusion to Geit's lead-based-paint claim thus depends upon whether his alleged injuries were caused by a "discharge, dispersal, spill, release or escape" of lead-based paint.

The Court of Appeals concluded that there was a genuine issue of material fact whether there was a "discharge, dispersal, spill, release or escape," which prevented summary judgment.[14] It adopted the reasoning in *Danbury Ins. Co.*[15] that an individual could be exposed to lead-based paint without lead being discharged, dispersed, or released.[16] Under that rationale, whether the pollution exclusion barred coverage of a particular claim of lead paint poisoning would hinge on the manner

[10] *Cartwright v. State*, 286 Neb. 431, 837 N.W.2d 521 (2013).

[11] *Professional Mgmt. Midwest v. Lund Co.*, 284 Neb. 777, 792, 826 N.W.2d 225, 236 (2012).

[12] *Id.*

[13] See *Dantzler, supra* note 1, 21 Neb. App. at 570, 842 N.W.2d at 122.

[14] See *Dantzler, supra* note 1.

[15] *Danbury Ins. Co., supra* note 8.

[16] See *Dantzler, supra* note 1.

of exposure. Thus, because David and Geit had not alleged whether the lead-based paint was inhaled as dust or fumes and/or ingested as chips or flakes, the Court of Appeals held that there was a genuine issue of fact and that the district court erred in entering summary judgment.[17]

As we explain below, we decline to adopt the reasoning in *Danbury Ins. Co.*[18] that only certain manners of exposure to lead-based paint constitute a "discharge, dispersal, spill, release or escape." We find persuasive the reasoning of other courts that the terms "discharge," "dispersal," "spill," "release," and "escape" encompass all possible movements by which harmful exposure to lead-based paint occurs.[19] Accordingly, we conclude that the manner of exposure to lead-based paint is not a material fact that prevents summary judgment, because the manner of exposure does not affect whether there was a "discharge, dispersal, spill, release or escape" for purposes of the pollution exclusion.

## Reliance on *Danbury Ins. Co.*

Relying upon *Danbury Ins. Co.*,[20] the Court of Appeals concluded that the phrase "discharge, dispersal, spill, release or escape" was ambiguous as applied to lead-based paint and that where the manner of exposure could not be determined, there was a genuine issue of material fact as to application of the pollution exclusion.[21] We conclude that such reliance on *Danbury Ins. Co.*[22] was error, because the reasoning of that case is not compatible with our case law.

---

[17] See *id*.

[18] *Danbury Ins. Co., supra* note 8.

[19] See, *Auto Owners Ins. v. City of Tampa Housing Auth.*, 231 F.3d 1298 (11th Cir. 2000) (applying Florida law); *Auto-Owners Ins. Co. v. Hanson*, 588 N.W.2d 777 (Minn. App. 1999); *Peace v. Northwestern Nat. Ins. Co.*, 228 Wis. 2d 106, 596 N.W.2d 429 (1999); *Farm Family Casualty Company v. Cumberland Insurance Company, Inc.*, No. K11C-07-006 JTV, 2013 WL 5496780 (Del. Super. Oct. 2, 2013) (unpublished opinion).

[20] *Danbury Ins. Co., supra* note 8.

[21] See *Dantzler, supra* note 1.

[22] *Danbury Ins. Co., supra* note 8.

Among state and federal courts, there are two general approaches to the application of pollution exclusions. Some courts interpret pollution exclusions as barring coverage for only those injuries allegedly caused by traditional environmental pollution, as understood historically.[23] Other courts interpret pollution exclusions as excluding coverage for all injuries allegedly caused by pollutants, because the exclusions are unambiguous as a matter of law.[24]

_____

[23] See, e.g., *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27 (1st Cir. 1999) (applying Maine law); *Keggi v. Northbrook Property and Cas. Ins.*, 199 Ariz. 43, 13 P.3d 785 (Ariz. App. 2000); *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 73 P.3d 1205, 3 Cal. Rptr. 3d 228 (2003); *American States Ins. Co. v. Koloms*, 177 Ill. 2d 473, 687 N.E.2d 72, 227 Ill. Dec. 149 (1997); *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679 (Ky. App. 1996); *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119 (La. 2000), *corrected on other grounds on rehearing* 782 So. 2d 573 (La. 2001); *Clendenin v. U.S. Fire*, 390 Md. 449, 889 A.2d 387 (2006); *Western Alliance Insurance Company v. Gill*, 426 Mass. 115, 686 N.E.2d 997 (1997); *Century Sur. Co. v. Casino W., Inc.*, No. 60622, 2014 WL 2396085 (Nev. May 29, 2014); *Nav-Its, Inc. v. Selective Ins. Co.*, 183 N.J. 110, 869 A.2d 929 (2005); *Andersen v. Highland House Co.*, 93 Ohio St. 3d 547, 757 N.E.2d 329 (2001); *Gainsco Ins. Co. v. Amoco Production Co.*, 53 P.3d 1051 (Wyo. 2002); *Auto-Owners Ins. Co. v. Potter*, 105 Fed. Appx. 484 (4th Cir. 2004) (applying North Carolina law); *Barney Greengrass, Inc. v. Lumbermans Mut. Cas. Co.*, No. 09 Civ. 7697 (NRB), 2010 WL 3069560 (S.D.N.Y. July 27, 2010) (memorandum opinion).

[24] See, e.g., *Devcon Intern. Corp. v. Reliance Ins. Co.*, 609 F.3d 214 (3d Cir. 2010) (applying Virgin Island law); *Nat'l Elect. Mfrs. v. Gulf Underwriters Ins.*, 162 F.3d 821 (4th Cir. 1998) (applying District of Columbia law); *Certain Underwriters at Lloyd's v. C.A. Turner Const.*, 112 F.3d 184 (5th Cir. 1997) (applying Texas law); *American States Ins. Co. v. Nethery*, 79 F.3d 473 (5th Cir. 1996) (applying Mississippi law); *Gerdes v. American Family Mut. Ins. Co.*, 713 F. Supp. 2d 1290 (D. Kan. 2010); *Mountain States Mut. Cas. Co. v. Roinestad*, 296 P.3d 1020 (Colo. 2013); *Heyman Assoc. v. Ins. Co. of State of Pa.*, 231 Conn. 756, 653 A.2d 122 (1995); *Deni Associates v. State Farm Ins.*, 711 So. 2d 1135 (Fla. 1998); *Reed v. Auto-Owners Ins. Co.*, 284 Ga. 286, 667 S.E.2d 90 (2008); *Bituminous Cas. v. Sand Livestock Systems*, 728 N.W.2d 216 (Iowa 2007); *McKusick v. Travelers Indem.*, 246 Mich. App. 329, 632 N.W.2d 525 (2001); *Midwest Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628 (Minn. 2013); *Heringer v. American Family Mut. Ins. Co.*, 140 S.W.3d 100 (Mo. App. 2004); *Cincinnati Ins. Co.*, supra note 5; *Bituminous Cas. Corp. v. Cowen Const.*,

In *Danbury Ins. Co.*,[25] the Connecticut court adopted the former, environmental approach to pollution exclusions. It rejected the claim that lead-based paint was unambiguously a pollutant within the meaning of the pollution exclusion.[26] Instead, it found support for and explicitly applied "an 'environmental' or 'industrial pollution' reading" of the pollution exclusion.[27] Under that interpretation, the court determined that "it would be reasonable to conclude that the [pollution exclusion] excludes coverage for injury caused by environmental or industrial pollution, but does not exclude coverage for injury alleged to be caused by exposure to lead paint."[28]

This adoption of a limited, environmental approach cannot be dismissed as inconsequential to the specific reasoning of *Danbury Ins. Co.*,[29] upon which the Court of Appeals relied. Without adopting a limited, environmental approach to pollution exclusions, the manner of exposure to lead-based paint would not be material to the application of the pollution exclusion. The court in *Danbury Ins. Co.*[30] determined that the manner of exposure was material, because it was persuaded by the reasoning in *Sphere Drake Ins. Co. P.L.C. v. Y.L. Realty Co.*[31]

---

*Inc.*, 55 P.3d 1030 (Okla. 2002); *Madison Const. v. Harleysville Mut. Ins.*, 557 Pa. 595, 735 A.2d 100 (1999); *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 283 Va. 624, 724 S.E.2d 707 (2012); *Quadrant Corp. v. American States Ins. Co.*, 154 Wash. 2d 165, 110 P.3d 733 (2005); *Peace, supra* note 19; *Clipper Mill Federal, LLC v. Cincinnati Ins. Co.*, No. JFM-10-1647, 2010 WL 4117273 (D. Md. Oct. 20, 2010) (memorandum opinion); *CBL & Associates Management, Inc. v. Lumbermens Mut. Cas. Co.*, No. 1:05-CV-210, 2006 WL 2087625 (E.D. Tenn. July 25, 2006) (memorandum opinion); *Farm Family Casualty Company, supra* note 19.

[25] *Danbury Ins. Co., supra* note 8.

[26] See *id.*

[27] See *id.* at 559, 727 A.2d at 283.

[28] See *id.* at 560, 727 A.2d at 283.

[29] *Danbury Ins. Co., supra* note 8.

[30] *Id.*

[31] *Sphere Drake Ins. Co. P.L.C. v. Y.L. Realty Co.*, 990 F. Supp. 240 (S.D.N.Y. 1997).

that the terms "discharge," "dispersal," "release," and "escape" did not describe the movement typically found in lead paint poisoning.[32] But the court in *Sphere Drake Ins. Co. P.L.C.*[33] reached that conclusion by interpreting the pollution exclusion according to terms of art specific to traditional environmental pollution. It found that the terms "discharge," "dispersal," "release," and "escape" "do not ordinarily encompass the type of 'movement' associated with lead paint poisoning," because they are "terms of art in environmental law, generally used to describe the improper disposal or containment of hazardous waste."[34] Consequently, it was necessary for the reasoning of *Sphere Drake Ins. Co. P.L.C.*[35] and, in turn, *Danbury Ins. Co.*[36] to interpret the terms "discharge," "dispersal," "release," and "escape" as terms of art specific to traditional environmental pollution.

This court has specifically considered and rejected the limited, environmental approach underlying the reasoning of *Danbury Ins. Co.*[37] In *Cincinnati Ins. Co.*,[38] we were faced with the task of interpreting an exclusion which was identical in all significant respects to the one in the instant case. Both barred coverage of injuries caused by the "discharge," "dispersal," "release," or "escape" of "pollutants." The insured argued that the exclusion applied to only traditional environmental pollution claims. However, we rejected such an interpretation, because it was not based on a "plain reading of the exclusion."[39] We focused on the language of the exclusion and found as a matter of law that it unambiguously supported a broader interpretation:

---

[32] See *Danbury Ins. Co., supra* note 8.

[33] *Sphere Drake Ins. Co. P.L.C., supra* note 31.

[34] *Id.* at 243.

[35] *Sphere Drake Ins. Co. P.L.C., supra* note 31.

[36] *Danbury Ins. Co., supra* note 8.

[37] *Id.*

[38] *Cincinnati Ins. Co., supra* note 5.

[39] *Id.* at 754, 635 N.W.2d at 119.

The language of the policy does not specifically limit excluded claims to traditional environmental damage; nor does the pollution exclusion purport to limit materials that qualify as pollutants to those that cause traditional environmental damage. The definition of "pollutant" in Cincinnati's [commercial general liability] policy includes substances that are "harmful or toxic to persons, property or the environment." By including "the environment" as a separate entity that could suffer harm from a pollutant, the pollution exclusion does not limit its scope of application to environmental pollution.[40]

We reached this conclusion in *Cincinnati Ins. Co.*[41] as a matter of law and without reference to the type of pollution that was allegedly involved (xylene fumes). Consequently, the principles established therein control the interpretation of similar pollution exclusions. In *Ferrell v. State Farm Ins. Co.*,[42] the Court of Appeals recognized the general applicability of *Cincinnati Ins. Co.*[43] to pollution exclusions. It applied the principles of *Cincinnati Ins. Co.*[44] to its interpretation of a pollution exclusion within the context of alleged mercury poisoning and concluded that the exclusion was unambiguous and should be interpreted according to its plain and ordinary meaning, "as a reasonable person might read the exclusion."[45] The pollution exclusion in *Ferrell*[46] was identical to the one in the instant case.

The broad interpretation given pollution exclusions in *Cincinnati Ins. Co.*[47] and *Ferrell*[48] is not compatible with the

---

[40] *Id.* at 755-56, 635 N.W.2d at 120.

[41] *Cincinnati Ins. Co., supra* note 5.

[42] *Ferrell v. State Farm Ins. Co.*, No. A-01-637, 2003 WL 21058165 (Neb. App. May 13, 2003) (not designated for permanent publication).

[43] *Cincinnati Ins. Co., supra* note 5.

[44] *Id.*

[45] *Ferrell, supra* note 42, 2003 WL 21058165 at *6.

[46] *Ferrell, supra* note 42.

[47] *Cincinnati Ins. Co., supra* note 5.

[48] *Ferrell, supra* note 42.

limited, environmental approach employed by the court in *Danbury Ins. Co.*[49] The two approaches cannot be reconciled. Therefore, in light of our case law, the Court of Appeals erred by adopting the reasoning of *Danbury Ins. Co.*[50]

## All Manners of Exposure to Lead-Based Paint Involve Discharge, Dispersal, Spill, Release, or Escape

Courts in other states have held that pollution exclusions should not be limited to traditional environmental pollution claims.[51] Within the states that have adopted this interpretation, several courts have concluded that all manners of exposure to lead-based paint involve the type of movement described in the pollution exclusion.[52]

In *Peace*,[53] the Wisconsin Supreme Court considered whether a pollution exclusion barred coverage of injuries allegedly arising from lead paint poisoning. The exclusion was identical in all significant respects to the one in the instant case.[54] As we did in *Cincinnati Ins. Co.*,[55] the Wisconsin court rejected the claims that the pollution exclusion was ambiguous and was limited to industrial pollution.[56] Interpreting the pollution exclusion according to the ordinary meaning of its words as derived from a nonlegal dictionary, the court

---

[49] *Danbury Ins. Co., supra* note 8.

[50] *Id.*

[51] See, e.g., *Mountain States Mut. Cas. Co., supra* note 24; *Deni Associates, supra* note 24; *Reed, supra* note 24; *McKusick, supra* note 24; *Board of Regents v. Royal Ins. Co.*, 517 N.W.2d 888 (Minn. 1994); *Cowen Const., Inc., supra* note 24; *PBM Nutritionals, LLC, supra* note 24; *Quadrant Corp., supra* note 24; *Peace, supra* note 19; *Farm Family Casualty Company, supra* note 19.

[52] See, *City of Tampa Housing Auth., supra* note 19; *Hanson, supra* note 19; *Peace, supra* note 19; *Farm Family Casualty Company, supra* note 19.

[53] *Peace, supra* note 19.

[54] See *id.*

[55] *Cincinnati Ins. Co., supra* note 5.

[56] See *Peace, supra* note 19.

determined that lead-based paint was a pollutant as defined in the exclusion.[57]

The Wisconsin court directly addressed whether lead paint poisoning involved a "discharge," "dispersal," "release," or "escape." The court's understanding of the movement accompanying lead paint poisoning was crucial to its analysis. It explained how lead paint poisoning occurs as follows:

> "Lead paint" . . . starts out as a liquid and becomes a solid after it is applied and dries. Over time, lead paint may chip and flake[,] becoming solid "waste." When it begins to deteriorate, it may give off "fumes." When it begins to disintegrate, it becomes dust—fine, dry particles of matter which, like smoke and soot, can float in the air affecting human respiration until it eventually settles on the ground.[58]

Based on this understanding of the movement in lead paint poisoning, the court did not view lead-based paint as always being a contaminant, but, rather, as having the "potential to contaminate air, water, and the human body when it disperses."[59] It concluded that "'lead paint that never leaves a wall or ceiling does not cause harm.'"[60] "Lead-based paint is an inchoate contaminant before it breaks down (unless it is directly discharged, say, into water); it becomes both an irritant and a contaminant after it breaks down into chips, flakes, dust, or fumes."[61]

The Wisconsin court concluded that the movement of lead-based paint during this process of deterioration constituted a dispersal, discharge, or escape "from the containment of the painted surface."[62] The court determined that the terms "discharge," "dispersal," "release," and "escape" "describe[d] the

---

[57] See id.

[58] Id. at 123, 596 N.W.2d at 436-37.

[59] See id. at 126, 596 N.W.2d at 438.

[60] Id. at 128, 596 N.W.2d at 439.

[61] Id. at 126, 596 N.W.2d at 438.

[62] See id. at 130, 596 N.W.2d at 440.

entire range of actions by which something moves from a con-
tained condition to an uncontained condition."[63] And because
"discharge," "disperse," and "escape" could be either transi-
tive or intransitive verbs, the court determined that the pollu-
tion exclusion encompassed movement that was "intentional
and purposeful or accidental and involuntary."[64] It concluded
that when so understood, the plain language of the pollution
exclusion barred coverage for injuries from alleged exposure
to "lead in paint that chips, flakes, or breaks down into dust
or fumes."[65]

In *Auto-Owners Ins. Co. v. Hanson*,[66] the Minnesota Court
of Appeals reached the same conclusions. It applied a "non-
technical approach" to a pollution exclusion and examined
its "ordinary meaning."[67] It concluded that "the chipping and
flaking of lead paint qualifies as a 'discharge,' 'dispersal,'
or 'release.'"[68] Similar to the Wisconsin Supreme Court in
*Peace*,[69] the Minnesota court focused on the realities of lead
poisoning and, in particular, the fact that lead-based paint is
not "harmful until dispersed and ingested."[70] The court con-
cluded that "[b]odily injury caused by ingestion of lead from
paint applied in a residence falls within . . . 'absolute pollu-
tion exclusions.'"[71] It found no distinction between "ingestion
of dispersed lead paint by way of eating, as opposed to other
forms of ingestion," such as inhalation.[72]

We find the approach taken by these courts to be per-
suasive. Lead-based paint is not toxic to a person until it

---

[63] See *id.* at 126, 596 N.W.2d at 438.

[64] See *id.*

[65] See *id.* at 130, 596 N.W.2d at 440.

[66] *Hanson, supra* note 19.

[67] See *id.* at 779.

[68] *Id.* at 781.

[69] *Peace, supra* note 19.

[70] See *Hanson, supra* note 19, 588 N.W.2d at 782.

[71] *Id.*

[72] See *id.* at 781.

breaks down into a form that can be taken into the body and absorbed.[73] Even courts that narrowly interpret pollution exclusions agree with this fact:

> [T]he language used to describe the movement of lead-based paint is instructive. . . . [L]ead-based paint deteriorates and degrades (slowly or rapidly, depending upon condition and use), and . . . the painted surface sheds microscopic dust through the process of exfoliation. . . . [T]his process of surface degradation occurs continuously at a slow rate. . . . [L]ead-based paint abrades and . . . it "chips, peels, chalks, or otherwise breaks down into dust." . . . [L]ead-based paint deteriorates or abrades, producing . . . dust, chips, and flakes. . . . Indeed, the United States Congress used similar language when, in the Residential Lead Based Paint Hazard Reduction Act, it identified the ingestion of household dust containing lead from "deteriorating or abraded" lead-based paint as the most common cause of lead poisoning in children. *See* 42 U.S.C. § 4851(a).[74]

Simply put, lead-based paint must separate from a painted surface before it can cause lead poisoning.

The separation of lead-based paint from a painted surface is inherent in every manner of exposure to lead-based paint. This separation is obvious in the case of exposure by ingesting or inhaling paint chips, flakes, dust, or fumes. The Court of Appeals quoted with approval a passage in *Danbury Ins. Co.*[75] that singled out exposure by chewing on an intact painted surface as a manner of exposure that might not involve a separation.[76] But we are not persuaded that ingestion by chewing on an intact painted surface is any different than exposure to already-detached paint chips or flakes. When a person is exposed to lead-based paint by chewing on an intact, painted

---

[73] See, *Hanson, supra* note 19; *Peace, supra* note 19.

[74] *Lititz Mut. Ins. Co. v. Steely*, 567 Pa. 98, 108-09, 785 A.2d 975, 981 (2001).

[75] *Danbury Ins. Co., supra* note 8.

[76] See *Dantzler, supra* note 1.

surface, the lead-based paint separates into chips or flakes before it is taken into the mouth and swallowed, just as with any other manner of ingestion.

The separation of lead-based paint from the painted surface unambiguously falls within the pollution exclusion. "'Discharge is a release, emission or issuance. . . . Dispersal is a scattering, spreading or distribution. . . . Release is a liberation, freeing, or permitting to escape. . . . Escape is a leaking or overflow.'"[77] "Spill" is "an act or instance of spilling."[78] Whether the separation of lead-based paint from the painted surface occurs due to the passage of time or as the result of human action, it can be described as a spreading or distribution (definition of dispersal).[79] Where the lead-based paint separates as dust or fumes, there has been a freeing (definition of release) or an emission (definition of discharge).[80] Thus, as commonly understood, the terms "discharge," "dispersal," "spill," "release," and "escape" unambiguously encompass the process by which lead-based paint moves from a painted surface into a form that can be absorbed by a person's body and cause lead poisoning.[81]

Because the above terms encompass the separation of lead-based paint that is inherent in every case of lead paint poisoning, the pollution exclusion is not ambiguous as applied to lead-based paint and a determination of the specific process of exposure in any particular case is not material to application of the exclusion. Regardless of how the lead-based paint is separated from the painted surface or what form it takes once it is separated, an individual's exposure to and absorption of

---

[77] *Peace, supra* note 19, 228 Wis. 2d at 127, 596 N.W.2d at 438 (citations omitted), quoting *Employers Casualty Co. v. St. Paul Fire & Marine Ins. Co.*, 44 Cal. App. 4th 545, 52 Cal. Rptr. 2d 17 (1996) (unpublished opinion).

[78] Webster's Third New International Dictionary of the English Language, Unabridged 2195 (1993).

[79] See *Peace, supra* note 19.

[80] See *id.*

[81] See *id.*

that lead-based paint results from the "discharge, dispersal, spill, release or escape" of a pollutant. Thus, it is not necessary to differentiate between the processes by which exposure occurs. It is not material to application of the pollution exclusion to determine the manner in which the injured party was allegedly exposed to lead-based paint.

The foregoing interpretation of pollution exclusions takes into account the realities of lead paint poisoning and is consistent with the broad interpretation we have given these exclusions.[82] It avoids the practical difficulties of compelling the court hearing the declaratory judgment to make a finding as to the causation of the alleged injuries in the underlying personal injury case in order to determine whether a "discharge, dispersal, spill, release or escape" had occurred. From a practical perspective, this would be problematic. The court's ultimate finding as to the cause of the alleged injuries might be contrary to the findings of causation in the underlying personal injury case. For these reasons, we conclude that the manner of exposure was not a material fact that prevented summary judgment.

### Application to Instant Case

We now consider whether the district court erred in entering summary judgment in favor of State Farm. An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[83]

State Farm was entitled to judgment as a matter of law that coverage of the lead-based-paint claim against Dantzler was barred by the pollution exclusion in the policy. It demonstrated the existence of a claim against Dantzler for injuries allegedly caused by lead paint poisoning. State Farm offered into evidence Geit's complaint against Dantzler in

---

[82] See *Cincinnati Ins. Co., supra* note 5.

[83] *Potter, supra* note 3.

the underlying personal injury case, which included allegations that Geit had been injured due to high levels of lead paint contamination in the rental property and that Dantzler had failed to prevent the lead-based paint from "chipping or peeling." Dantzler's evidence did not contradict the existence of a claim alleging injury from lead-based paint, but, rather, acknowledged the claim.

Once State Farm demonstrated the existence of a claim that alleged injury from lead-based paint, it could be concluded as a matter of law that the claim for which Dantzler sought coverage was one that involved an "alleged . . . discharge, dispersal, spill, release or escape" of a pollutant. Lead-based paint cannot cause injury unless it has separated from the painted surface. Consequently, regardless of the specific manner of exposure, an allegation that exposure to lead-based paint has caused injury necessarily contains an implicit claim that the paint separated from the original surface.[84] Such a separation falls within the meaning of the terms "discharge," "dispersal," "spill," "release," and "escape."[85] Thus, where there is an allegation of exposure to lead-based paint, for purposes of the exclusion, there is an allegation of a "discharge, dispersal, spill, release or escape" of lead-based paint.

The pollution exclusion in Dantzler's policy barred coverage of injury arising from an "alleged . . . discharge, dispersal, spill, release or escape" of a pollutant, such as lead-based paint. Therefore, because there was no factual question as to the existence of a claim that alleged injury from lead-based paint, the district court did not err in concluding as a matter of law that the pollution exclusion barred coverage of that claim.

The district court correctly entered summary judgment in favor of State Farm. Therefore, we reverse the decision of the Court of Appeals and remand the cause with direction to enter an order affirming the entry of summary judgment in favor of State Farm.

---

[84] See, *Peace, supra* note 19; *Farm Family Casualty Company, supra* note 19.

[85] See, *Hanson, supra* note 19; *Peace, supra* note 19.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the Court of Appeals. We remand the cause with direction to enter an order affirming the district court's entry of summary judgment in favor of State Farm.

Reversed and remanded with direction.

_____

Eric McDougle, LMHP, PLADC, appellant, v.
State of Nebraska ex rel. Jon Bruning,
Attorney General, appellee.

___ N.W.2d ___

Filed September 12, 2014.    No. S-12-1186.

1. **Jurisdiction.** Subject matter jurisdiction is a question of law for the court.
2. **Statutes: Appeal and Error.** The meaning and interpretation of a statute are questions of law, which an appellate court reviews independently of the lower court.
3. **Administrative Law: Jurisdiction: Appeal and Error.** Where a district court has statutory authority to review an action of an administrative agency, the district court may acquire jurisdiction only if the review is sought in the mode and manner and within the time provided by statute.
4. **Jurisdiction: Appeal and Error.** If the court from which an appeal was taken lacked jurisdiction, the appellate court acquires no jurisdiction.
5. **Administrative Law: Words and Phrases.** An administrative agency is a neutral factfinding body when it is neither an adversary nor an advocate of a party.
6. **Administrative Law: Parties.** When an administrative agency acts as the primary civil enforcement agency, it is more than a neutral factfinding body.
7. ____: ____. An agency that is charged with the responsibility of protecting the public interest, as distinguished from determining the rights of two or more individuals in a dispute before such agency, is more than a neutral factfinding body.
8. ____: ____. The Attorney General's involvement as the plaintiff in a petition for discipline does not negate the role of the Division of Public Health of the Department of Health and Human Services in disciplining a credential holder as something more than only a neutral factfinding body.
9. **Statutes: Words and Phrases.** As a general rule, the word "shall" in a statute is considered mandatory and is inconsistent with the idea of discretion.
10. **Statutes: Appeal and Error.** While statutes relating to the same subject matter will be construed so as to maintain a sensible and consistent scheme, an appellate court must do so by giving effect to every provision.
11. **Administrative Law: Parties: Appeal and Error.** There is no inherent inconsistency between Neb. Rev. Stat. §§ 38-186 (Cum. Supp. 2012) and 38-187